The **FIDELITY AND CASUALTY COM-
PANY OF NEW YORK**, a corpora-
tion, Appellant,

v.

**BANK OF ALTENBURG**, Appellee.

No. 15052.

United States Court of Appeals
Eighth Circuit.

Oct. 27, 1954.

Gerald B. Rowan and Allen L. Oliver, Cape Girardeau, Mo. (Oliver & Oliver, Cape Girardeau, Mo., with them on the brief), for appellant.

Rush H. Limbaugh, Cape Girardeau, Mo. (Limbaugh & Limbaugh, Cape Girardeau, Mo., on the brief), for appellee.

Before GARDNER, Chief Judge, and THOMAS and COLLET, Circuit Judges.

COLLET, Circuit Judge.

This action is brought by the plaintiff, a small bank, to recover on a bond executed by defendant insuring it against losses caused by "false pretenses". The loss resulted from a "check kiting" scheme conceived and carried out by one William J. Schneier. Usually there are two banking institutions involved in such a scheme. In this instance they were the plaintiff and the Brazeau Bank. Both were small banks in rural communities only a few miles apart. Both incurred losses in substantial amounts. The Brazeau Bank closed as a result. It was taken over by the Federal Deposit Insurance Corporation, which instituted an action on a bond substantially similar to the one involved herein for its loss. That case was determined by this court on appeal in Hartford Accident & Indemnity Co. v. Federal Deposit Ins. Corp., 8 Cir., 204 F.2d 933. The factual details in this case are amply stated in the trial court's memorandum opinion, Bank of

Altenburg v. Fidelity & Casualty Co., D.C., 118 F.Supp. 529, 530:

"This case is a sequel to Hartford Accident & Indemnity Co. v. Federal Deposit Ins. Corp., 8 Cir., 204 F.2d 933.

"William J. Schneier obtained money by false pretenses, from the Brazeau Bank, by depositing checks in his personal account in the Brazeau Bank, drawn on his partnership account in the name of H & F Truck Service in the plaintiff bank. Schneier, as an integral part of the fraud perpetrated on the Brazeau Bank, was drawing checks on his personal account in the Brazeau Bank and depositing them in the H & F Truck Service account in plaintiff bank, to cover checks deposited in the Brazeau Bank. Schneier was engaged in 'check kiting' and on a large scale.

"The plaintiff bank apparently first broke the chain when it refused payment on a check, drawn on it and deposited in the Brazeau Bank, for 'insufficient funds.' Thereafter, and within a period of days, each of the banks named returned all outstanding checks drawn by Schneier.

"Schneier's relations with plaintiff bank extend from February to late December, 1950. The Brazeau Bank lost $18,490 and the loss forced it to close. Suit was brought and recovery had by the Brazeau Bank on a bond of the Hartford Accident & Indemnity Co., v. Federal Deposit Ins. Corp., 8 Cir., 204 F.2d 933, protecting against loss resulting from false pretense. In this case the Bank of Altenburg seeks recovery of $15,338.71, plus interest, damages and attorney's fees, on the same basis. Jury was waived. We now have the case for ruling on its merits.

"The principal issue now turns on defendant's claim that plaintiff

did not rely on Schneier's representation that checks deposited in it would be paid on presentation and Schneier did not deceive the plaintiff, and that the transactions between plaintiff and Schneier were in fact granting of loans and plaintiff's loss results from nonpayment of the loans.

"The terms in the policy relied on for recovery are:

" '(B) Any loss of Property through robbery, larceny (whether common-law or statutory), burglary, theft, false pretenses, hold-up, misplacement, mysterious unexplainable disappearance, damage thereto or destruction thereof, whether effected with or without violence or with or without negligence on the part of any of the Employees, * * *.'

"The record shows that at the very time Schneier opened his account with plaintiff in February, 1950, he initiated his check kiting scheme and that it continued regularly thereafter until December 30, 1950. On December 26th Schneier deposited in the H & F Truck Service account in plaintiff bank a check in the sum of $6,963.14 drawn on the Brazeau Bank. On December 28th he made a deposit of a like check for $6,894.70. On December 30th he made a deposit of a like check for $6,930.42. On December 30, 1950, a check was presented to plaintiff bank drawn by Schneier on the H & F Truck Service account which had been deposited in the Brazeau Bank. There were not sufficient funds in the account to pay it and the check was returned to the Brazeau Bank. In due course (three, four or five days), clearing through a St. Louis bank, the three checks drawn on the Brazeau Bank described above were returned to plaintiff marked 'insufficient funds' by the Brazeau Bank. Prior to the return of these three checks plaintiff had permitted Schneier to check out most of the money purported to be represented by the three checks. Plaintiff was able to reduce its loss from a balance in the account and by other means, from $20,788.26 to $15,338.71. After notice to defendant of such loss, payment on the bond was refused. This suit followed. There is no controversy as to the physical manner in which Schneier operated to obtain the funds from the two banks, or the amount of plaintiff's loss on the three checks.

"Defendant charges, and plaintiff concedes, before recovery can be had in this suit, plaintiff must establish that the essential elements of obtaining money by false pretenses existed at the time it paid out funds on the three checks which caused its loss. One essential element of a case based on false pretense, and which is brought into issue, is that 'the representation must be believed by the person allegedly defrauded and must be relied on and be the effective cause in inducing the party to whom it was made, to part with his property.' (Defendant's brief.) By brief, defendant reduces its defense to a charge that plaintiff 'was in fact simply loaning Schneier the money represented by the checks for the three, four or five days it took them to clear through the St. Louis Clearing House.'

"The details of Schneier's fraudulent operations are more fully developed in this case than in the Brazeau Bank case. To reach a conclusion as to whether plaintiff did or did not believe and rely upon Schneier's representations that the three checks involved would be paid on presentation to the Brazeau Bank, we must view the case as the situation was presented to those in charge of plaintiff bank on the occasions and at the time under in-

quiry. Objectively, the issue before the court is not a simple one. This results in part from a record that reveals at once all the facts of Schneier's transactions with the plaintiff, from the inception of his account until the fraud was stripped of all pretense, rather than as Schneier's operations were presented from day to day to those in charge of plaintiff bank's operations.

"The deposit slips and the records of the H & F Truck Service account in plaintiff bank shed light on the question as to how the situation developed to those in charge of plaintiff bank, at the time the deposits were made. From the inception of the account on February 14th until December 30th, the deposit slips are uniform in some particulars. Excepting one on April 20, 1950, for $22.50, all deposits are for large sums. They vary from $6,000 to $8,000. With the exception of two deposits they were always made up of one large check and a number of small items, and in some cases currency was included. The large check in each deposit was, according to the undisputed testimony, drawn on the Brazeau Bank. The large check in each deposit did not change significantly in the account throughout the whole period. They were for odd sums and varied between $6,000 and $7,000. The one included in the initial deposit was for $6,361.69, in a total deposit of $6,431.43. The last one was for $6,930.42, included in a total deposit of $7,064.11. The deposit slips show deposits made with substantial regularity, generally from two to three to four days apart.

"The ledger sheets are also material on the issue. They show the account, opening on February 14, 1950, was first overdrawn on April 14th in the sum of $4,026.80. This overdraft was taken up the following day by a deposit of $6,546.33, including a check on the Brazeau Bank for $6,352.25. Thereafter the overdrafts were as follows: On May 24, $122.34; May 26, $4.78; May 29, $97.76; June 12, $766.62; June 16, $1,101.95; June 19, $926.50; June 23, $1,140.02. There were no more overdrafts until October 13 when there was one for $5,398.32. On October 30 there was an overdraft of $103.07; November 3, $521.93; November 6, $10.28; November 10, $264.19; November 13, $232.40; November 29, $46.88; December 15, $313.09; December 16, $827.55; December 18, $919.88. In every instance of overdraft it was taken up the day following by a substantial deposit which always included a check drawn by defendant on his personal account in the Brazeau Bank. The average daily balance was in excess of $3,400.

"The large checks included in Schneier's deposits drawn on the Brazeau Bank eventually gave concern to the employees in charge of plaintiff bank. After the November board meeting Mr. Poppitz, the cashier, told Mr. Mueller, a member of the Board of Directors, of the large checks being deposited by Schneier. Mueller lived in the same village as Schneier and was acquainted with him. Poppitz asked Mueller to see Schneier 'and find out why he was writing such big checks.' Mueller talked to Schneier with the result:

" 'Mr. Schneier told me that he was buying a lot of poultry and eggs and livestock, that he was selling that here in St. Louis, collecting the money in his name, taking it to Brazeau and depositing it in his account, and then he would write a check to the H. & F. Truck Line to settle it, trucking and all.'

"The regularity of the inclusion by Schneier in his deposits in plain-

tiff bank of large checks drawn by him on the Brazeau Bank raised a question, among those who were in charge of plaintiff bank, as to Schneier's method of financial operations. The subject was discussed among the employees. Mr. Preusser, assistant cashier of plaintiff bank, testified to this. He summed up the conversations among the employees as follows:

" 'We discussed the matter, and whenever we discussed it, we always ended in the same conclusion, that the H. & F. Truck Service met their obligations, and just a few times it happened that they did not have enough there, and we called them by telephone and they brought a deposit so we could pay their checks.'

"On cross-examination he gave the following testimony:

" 'Q. * * * if you had not permitted the drawing against an account until a check had time to clear and be collected, then Mr. ――― the H. & F. Truck Service account in that sense, during all the period of 1950, would never have had a balance in it, would it? A. Could be.

*      *      *      *      *      *

" 'Q. It was obvious to you during your conversations with Mr. Poppitz and Mr. Meyr that what Mr. Schneier was doing was covering a check drawn against the H. & F. Truck Service account by a check drawn against his personal account in the Bank of Brazeau? A. That is the way it seemed.

" 'Q. Yes. And that is what you discussed with each other, is it not? A. Yes.'

"Under examination by the Court the witness testified:

" 'Q. You never did think he had enough money to cover those checks? A. No, mostly likely not.

" 'Q. Did you think then that he was using the funds of the two banks to finance his business with? A. Well, that is the way it seemed.'

"The above testimony was qualified on re-examination as follows:

" 'Q. * * * Now, did you say that that was obvious to you then or that it is obvious to you now? A. No, toward the last. It wasn't about every one of the checks.'

"This testimony reflects the attitude and reasoning with respect to care and judgment of those in charge of plaintiff bank at the time the transactions were taking place that eventually led to plaintiff's loss. We quote further:

" 'Q. * * * when you were discussing the matter with the other employes of the bank, did you ever take the account and compare the deposits of checks on the Bank of Brazeau with checks drawn on your bank and deposited with the Bank of Brazeau, how they seemed to correspond, did you ever do that? A. No, we did not do that.

*      *      *      *      *      *

" 'A. We noticed the big checks.

" 'Q. You noticed they were substantial, in like amounts? A. That is right.

" 'Q. What conclusion did you draw from that? A. Well, we just did not know what he was doing.

" 'Q. * * * did you have any question whether he was transacting a legitimate business or not, so far as the two banks were concerned?

*      *      *      *      *      *

" 'A. Well, we discussed that, too, and the conclusion we always got or the point we always arrived at was that he did meet his obligations.

" 'Q. That he did? A. That he did meet his obligations at the bank and did not overdraw.

" 'Q. As long as that was the situation, you would let the matter

ride, is that right? A. That is right.'

"On October 28, 1950, the cashier of the Brazeau Bank wrote to plaintiff bank regarding the activities of Schneier. In this letter it was indicated that the Brazeau Bank was suspicious about the large checks which were coming through for deposit drawn on the H & F Truck Service and the large checks being drawn on Schneier's personal account in the Brazeau Bank. This letter mentioned that these transactions happened about three times a week. The letter of the Brazeau Bank was not answered. Several weeks later a member of the board and another officer from plaintiff bank visited the Brazeau Bank. Only generalities were discussed. No examination was made of the personal account of Schneier.

"About December 15th Mr. Vogel, who was the partner of Schneier in the H & F Truck Service, showed Mueller the H & F Truck Service bank statement. The partner was without knowledge why Schneier was writing the large checks.

"Mr. Mueller again saw Schneier about December 15th. This time Schneier volunteered a statement about getting working capital in St. Louis. Again the discussion was general, surrounded with uncertainty.

" 'Questions by the Court:

" 'Q. * * * You say when you went to see Mr. Schneier, about December 15, 1950, is that correct? A. Yes.

" 'Q. That he said after the first of January he was going to get some working capital from St. Louis? A. Yes.

" 'Q. And he said he would not write any more big checks? A. That is right.

" 'Q. How did you associate the getting of capital with ceasing to write big checks? A. I just did not understand it. I did not know how he really was operating.

" 'Q. You did not put any significance in the connection of those two? A. No.'

"Mueller was asked if he had ever heard of the term 'check kiting.' It was a new word to him. 'I always figured the bank account, there is enough money there to cover it, all your checks, and there is a balance over, there couldn't be anything wrong with the bank account.'

"The assistant cashier's lack of knowledge of kiting checks is typical of the other employees of the bank. He had never had any experience with the fraudulent process. It had never happened before in the experience of the Bank of Altenburg.

"A Judge, over the years, hears detailed various schemes used by cunning and resourceful criminals to defraud. This does not aid in understanding the viewpoint of the operators of small banks in isolated communities, such as the plaintiff bank and the Brazeau Bank. It will not do to use the norm of urban bankers, lawyers or businessmen. We must not forget the customers of these two banks are the neighbors of the directors and employees of the banks. Small town and isolated residents are just as inclined to suspect strangers as they are prone to trust their neighbors. There is very little in the life of the individual, business or otherwise, that is not common knowledge in the small community. Belief in the integrity of their neighbors is seldom disappointed. How long plaintiff bank has operated we do not know, but until Schneier disrupted the quiet complacency of the community, apparently no one in it had ever heard of check kiting. The record reveals the employees of plaintiff bank first

had a question about Schneier's account and eventually the question became a suspicion, but to reach a conclusion that Schneier was engaged in a fraudulent enterprise was a thought they resisted as though it were the plague. That this attitude is real we think is evidenced by the bank's action when at last they were compelled to face the reality of Schneier's fraud. A number of checks given by Schneier for small sums, but in their total several hundred dollars, came to the bank for payment. Apparently they were in payment to small farmers for livestock that Schneier had purchased. These checks were paid with full knowledge on the part of the bank that the act of paying them was increasing the bank's loss. When the Court asked the official, while on the stand, why the bank would do such a thing, his face took on a pained expression and without any hesitancy or apparent feeling of lack of business judgment, he replied that the bank did not want to disappoint the holders of the checks, or words to that effect. The naiveness of the operators of plaintiff bank, in their belief in the common honesty of a man they knew, would be refreshing did it not at the same time represent, in its use, such utter incompetence for the work of handling other people's money. But defendant wrote the bond in issue with full knowledge of the bank's location.

"There is direct evidence that the employees in charge of plaintiff bank, believed Schneier's checks, constituting the loss in suit, would be honored on presentation to the Bank of Brazeau. There is circumstantial evidence of such belief in the payment of the amount of the checks, excepting a small sum, out of the bank's funds before the checks cleared. Additional facts presented by this record support the contention of plaintiff that they relied upon Schneier's representation that the checks would be paid on presentation to the Brazeau Bank. Plaintiff was dealing with Schneier as a resident of the community of long standing, a man of supposed honor and good reputation. Schneier was in a business of large operations involving substantial sums of money for the purchase of livestock and its transportation to St. Louis. The plaintiff bank and the Brazeau Bank were competitors. Schneier's account on paper was a valuable account with its daily balance in excess of $3,400 and neither bank was willing to reveal its records to the other bank or do anything to lose Schneier's account except as a last resort. Schneier had always taken care of overdrafts promptly. The Brazeau Bank, with as much knowledge apparently as plaintiff bank, permitted itself to be used by Schneier with the same apparent lack of grasp of the true situation as did plaintiff, to its loss and destruction.

"We find plaintiff has carried the burden of proof by showing, by the greater weight of the credible evidence, that the losses sued for come within the provisions of the bond.

"The plaintiff bank was negligent in handling the Schneier account in that it failed to use that degree of care to protect itself from loss which an ordinarily prudent person would use under the same or like circumstances. Loss by false representation, incurred as the result of negligence, is not a defense.

"The deposit of the three checks sued on did not constitute a loan by the plaintiff bank to Schneier. When the loan theory of defense is rejected, we must find that the plaintiff either was the victim of Schneier's false pretenses, or hold that plaintiff bank deliberately gave away its funds in an amount equal

to almost one-third of its capital. To hold plaintiff did not rely on Schneier's representations, and did not believe the checks would be paid on presentation can lead to no other conclusion. The latter conclusion we cannot accept. It would be an act of such character as to be dishonest. We think plaintiff bank's officers and employees were grossly negligent, but not dishonest.

"Other issues raised by the answer are determined by the law as declared by the Court of Appeals in the Brazeau Bank case."

The defenses relied upon, which are preserved on this appeal are (1) "that the evidence does not establish the essential elements to make a case of obtaining money or property by false pretenses," (2) that the case is controlled by the law of Missouri, that the offense of false pretense has been defined by Missouri Statute, and under that law the facts do not make out the Missouri statutory crime of obtaining money by false pretenses, (3) that the loss sustained by plaintiff was not covered by the bond because it was not a loss from plaintiff's premises, and (4) that the loss resulted from a transaction in the nature of a loan which was specifically excluded from coverage in the bond.

Concerning the first assignment, it is asserted that two essential elements of the offense of obtaining money by false pretense are lacking—that there must be a representation of a past or existing (but not future) fact, and the representation must be believed by the person defrauded and must be relied upon and be the effective cause in inducing the party to whom it was made to part with his property. (We have stated those elements in the language used by defendant in its brief.)

■ Defendant says that Schneier's representation to plaintiff bank was in effect that the checks he deposited with it drawn on the Brazeau Bank would be paid when presented to that bank. It says that was a representation of a promissory nature of a future, not an existing fact. But that is not the manner in which the plaintiff's officials construed Schneier's conduct in presenting the checks to it for deposit. The representation implied was that sufficient funds were on deposit to meet the checks. That was a representation of a present existing fact.

■■ The second element said to be lacking, that the bank officers must have believed the implied representation of Schneier that the checks were good, either existed or was absent, dependent upon the facts developed at the trial. The charge that this element was not established amounts to an assertion that the evidence did not sustain the trial court's conclusion to the contrary. The case was tried without a jury. The trial court developed this question in some detail in the memorandum opinion heretofore quoted. Our examination of the record discloses no justification for rejecting that finding. The further contention made in connection with the foregoing argument, that if plaintiff's officials did not actually know the implied representation was false they should have known, was properly answered by the trial court that negligence of those officials is not, under the bond, a defense to a loss from false representations.[1]

The second assignment that under the law of Missouri the established facts did not make out a case of false pretenses but at most only constituted the misdemeanor of uttering a check with knowledge that there were insufficient funds in the bank upon which it was drawn for its payment, is based upon the premise that the term "false pretenses" used in the bond must be given

---

1. From the insuring clause: " 'Any loss of property * * * whether effected with or without violence or with or without negligence on the part of any of the Employees * * *.' "

the same technical meaning in which the term is used in the Missouri statute defining that criminal offense. We do not explore that question further than the authorities cited by both parties. Those authorities are not decisive of the question either way. For present purposes we will assume that defendant's statement of the law of Missouri is correct. We do not recommend that assumption when the correctness thereof is decisive. It is not decisive here, because the scheme practiced did fall within the Missouri statutory definition of false pretenses.

Defendant assumes that all that was involved in the false pretenses practiced was the presentation of a check and obtaining money or something of value therefor, knowing at the time that there were insufficient funds in the bank upon which it was drawn. Such conduct is characterized by § 561.460, RSMo 1949, V.A.M.S., as a misdemeanor and does not use the term false pretense in defining the offense.[2] In that respect the definition of the misdemeanor differs from the definition of other offenses which do include in their definition the term false pretenses. Statutes defining offenses in which the term false pretenses is used are § 561.370 and § 561.-450 RSMo 1949, V.A.M.S. Section 561.-370 uses the following language:

"561.370. Obtaining money, goods, by false pretenses.—Every person who, with intent to cheat or defraud another, shall designedly, by color of any false token or writing or by any other false pretense, * * * obtain from any person any money, personal property, right

in action or other valuable thing or effects whatsoever, * * * shall upon conviction thereof be punished in the same manner and to the same extent as for feloniously stealing the money, property or thing so obtained."

The pertinent language of § 561.450 is:

"561.450. Confidence game or fraudulent checks—penalties.—Every person who, with the intent to cheat and defraud, shall obtain or attempt to obtain, from any other person, or persons, any money, property or valuable thing whatever by means or by use of any trick or deception, or false and fraudulent representation, or statement or pretense, or by any other means or instrument or device, commonly called 'the confidence game,' or by means or by use, of any false or bogus check or by means of a check drawn, with intent to cheat and defraud, on a bank in which the drawer of the check knows he has *no funds* or by means or by use, of any corporation stock or bonds or by any other written or printed or engraved instrument or spurious coin or metal, shall be deemed guilty of a felony and upon conviction thereof be punished by imprisonment in the state penitentiary for a term not exceeding seven years." (Italics supplied.)

Check kiting, as practiced here, involves more than the mere use of a check with insufficient funds in the bank to meet it. It involves a series of acts which together constitute a scheme, a studied device, false pretenses

2. "561.460. Checks or drafts drawn when funds insufficient. Any person who, to procure any article or thing of value or for the payment of any past due debt or other obligation of whatsoever form or nature or who, for any other purpose shall make or draw or utter or deliver, with intent to defraud any check, draft or order, for the payment of money, upon any bank or other depositary, knowing at the time of such making, drawing, uttering or delivering, that the maker or drawer, has not sufficient funds in or credit with, such bank or other depositary, for the payment of such check, draft, or order, in full, upon its presentation, shall be guilty of misdemeanor, and punishable by imprisonment for not more than one year, or a fine of not more than one thousand dollars, or by both fine and imprisonment."

built upon a series of false representations designed to lull the banks involved into a feeling of confidence and security. The bad check is given. Money or credit is received from a bank other than the one on which the check is drawn. If credit is taken, that credit is usually drawn on immediately. The check kiter then deposits a check in the bank upon which the first check is drawn before the first check arrives there. The second check is drawn on the bank from which the first money or credit is received. Credit is taken for it and that credit covers the first check when it comes in and possibly additional credit. Then the process is carried on, back and forth, until the scheme is discovered. In this instance it went on from February, 1950, until late in December, 1950. The practice is a false pretense under § 561.370, if not a "trick" or "deception" involving a false and fradulent representation, or a "confidence game" under § 561.450. See State v. Whitledge, Mo., 269 S.W.2d 748, 751.[3] The mere fact that the giving of a check with insufficient funds in the bank to meet it is one of the series of acts constituting the false pretense or the trick, device, or game, does not take the practice of "check kiting" out of the definition of the offenses defined by § 561.370 or § 561.450. Neither State v. Richman, 347 Mo. 595, 148 S.W.2d 796, nor State v. Griggs, Mo., 236 S.W.2d 588,[4] relied on by the defendant, so holds. In each of those cases (which were criminal prosecutions) the act constituting the offense charged was the giving of a worthless check, in the Richman case a check with insufficient funds in the bank to meet it, in the Griggs case with *no*

funds in the bank upon which it was drawn. No such scheme, device, game or false pretenses involved in check kiting was involved in those cases. We held in the Brazeau Bank case, Hartford Accident & Indemnity Co. v. Federal Deposit Ins. Corp., 8 Cir., 204 F.2d 933, 937:

> "We think the District Court correctly concluded that the loss sustained by the Brazeau Bank was directly caused by false pretenses and was within the coverage of the bond."

(See also Federal Deposit Ins. Corp. v. Hartford Acc. & Indem. Co., D.C., 106 F.Supp. 602.) While the question was not presented in the Brazeau Bank case in the way it is now presented, we adhere to the opinion there expressed and supplement our former expression by now further holding that the conduct practiced on plaintiff herein not only constituted false pretenses under the ordinary meaning of the term but also constituted false pretenses under the Missouri statutory definition of the criminal offense.

The third assignment is based upon the following premises. It is said that "Property", as defined in the bond, refers to tangible property, that the insuring clause requires that a loss of such tangible property must occur through false pretenses and that the loss must be of tangible property from defendant's premises as a result of false pretenses practiced on defendant's premises. From those premises it is argued that the loss in this instance was not covered by the bond. The argument is both resourceful and ingenious. It was presented to

---

3. Decided July 12, 1954, reported August 24, 1954, subsequent to the filing of briefs in this case.

4. It is interesting to note that in State v. Evelyn Hartman, Mo., 272 S.W.2d 276, the Griggs case was overruled in certain important respects. The Hartman case was transferred from Division Two to the Missouri Supreme Court en banc and

there argued and submitted on October 7, 1954. The opinion in the Hartman case by Division Two has not, of course, under these circumstances, been reported. Having examined the Division opinion in the Hartman case, and reaching the conclusion that its outcome in the court en banc will not be decisive in this case, we do not await the final determination of the Hartman case.

the trial court in the Brazeau Bank case, Federal Deposit Ins. Corp. v. Hartford Acc. & Indem. Co., supra, and overruled. It was not presented to us on the appeal of that case. See Hartford Accident & Indemnity Co. v. Federal Deposit Ins. Corp., 8 Cir., 204 F.2d 933.

■ We are unable to agree with the argument that the bond contemplated reimbursement only in the event tangible or physical property was taken from the bank by means of false pretenses. The bond was to cover banking operations. The losses covered were very broad. The term "Property" was defined to include a multitude of types of assets of the bank, including "money, currency, coin * * * securities, evidences of debt, * * * certificates of deposit * * * rights, transfers, coupons, drafts, bills of exchange, acceptances, promissory notes, checks, money orders, * * * and all other instruments similar to or in the nature of the foregoing * * * and chattels which are not hereinbefore enumerated and for which the Insured is legally liable." Applying the language used in the Brazeau Bank case, Hartford Accident & Indemnity Co. v. Federal Deposit Ins. Corp., supra, in construing another provision of a similar bond, "it is not conceivable to us that any disinterested banker, insurance underwriter, or lawyer would construe" this bond as not covering assets of the bank lost through a "check kiting" scheme practiced upon it.

The fourth and last assignment that the loss resulted from a transaction in the nature of a loan is based upon an exclusion clause of the bond that it did not cover: "Any loss the result of the complete or partial nonpayment of or default upon any loan made by or obtained from the Insured, whether procured in good faith or through trick, artifice, fraud or false pretenses, except * *."

The facts were developed in more detail in this case than in the Brazeau Bank case, but the essential elements of the scheme practiced in both cases were the same. In fact, as heretofore shown, the series of events and practices which resulted in the loss by the Brazeau Bank constituted the identical scheme, device and false pretenses which brought about the loss in this case. In the former case we said:

■ " 'Contracts of insurance, like other contracts, must be construed according to the terms which the parties have used, to be taken and understood, in the absence of ambiguity, in their plain, ordinary, and popular sense.' Bergholm v. Peoria Life Ins. Co., 284 U.S. 489, 492, 52 S.Ct. 230, 231, 76 L.Ed. 416; State ex rel. Prudential Ins. Co. of America v. Shain, 344 Mo. 623, 627, 127 S.W.2d 675, 677.

"It is not conceivable to us that any disinterested banker, insurance underwriter, or lawyer would construe the word 'loan', as used in the exclusion clause of this indemnity bond, to cover the obligation [of Schneier] imposed by law to reimburse a bank for money or credit obtained through the use of worthless checks."

The same reasoning applies here.

Finding no reversible error, the judgment appealed from is affirmed.