**MERCHANTS–PRODUCE BANK,**
Plaintiff,

v.

**UNITED STATES FIDELITY AND
GUARANTY COMPANY,**
Defendant.

No. 16168–1.

United States District Court
W. D. Missouri, W. D.

Oct. 30, 1969.

Lawrence R. Brown, Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, Mo., for plaintiff.

Roy A. Larson, Sprinkle, Carter, Sprinkle, Larson & Hanna, Kansas City, Mo., for defendant.

## MEMORANDUM OPINION

JOHN W. OLIVER, District Judge.

### I.

#### Findings of Fact

This is an action on a Bankers Blanket Bond. Twenty-six of our findings of fact are stipulated. The stipulated findings have been given numbered designations. Findings which carry a letter after the paragraph number, such as "7a," are our independent findings based on the evidence. The latter findings, for the most part, follow language suggested by plaintiff although we have modified the suggested language in particular instances.

We make a few additional findings of fact in part II of this memorandum opinion which should be considered as having been made pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

1. Plaintiff is a corporation incorporated under the laws of the State of Missouri, engaged in the general commercial banking business, with its principal place of business at Sixth and Walnut Streets, Kansas City, Missouri.

2. Defendant is a corporation incorporated under the laws of the State of Maryland, with its principal place of business outside of the State of Missouri, and is engaged in the business of writing insurance including Banker's Blanket Bonds for a premium in Missouri and elsewhere. The parties further admit the jurisdictional facts.

3. On or about April 12, 1958, defendant for a valuable consideration executed and delivered to plaintiff a Banker's Blanket Bond, Standard Form No. 24, bearing No. 38283-02-241-58, which bond remained in force and effect continuously thereafter until April 12, 1964. A copy of said bond has been identified as P. Ex. 1, and defendant's notice of cancellation of said bond has been identified as P. Ex. 31.

4. As part of its general banking business plaintiff in 1963 and 1964 maintained and operated a trust department.

5. Plaintiff through its trust department acted as transfer agent for General Leasing Corporation, a Kansas corporation, under appointment of the Board of Directors of General Leasing Corporation, by resolution of the Board of that corporation adopted at a meeting held on March 20, 1963. P. Ex. 2 is a certified copy of this resolution furnished the plaintiff and P. Ex. 3 is the minutes of the Board of Directors meeting at which the resolution was adopted. Thereafter, and at a meeting held on April 25, 1963, the Board of Directors of General Leasing Corporation, pursuant to authority from the stockholders of that corporation changed its name to General United Corporation and plaintiff continued as transfer agent for the corporation. P. Ex. 4 is the minutes of the stockholders meeting and P. Ex. 5 is the minutes of the Board of Directors meeting at which this change of name was accomplished.

6. Pursuant to the resolution of the Board of Directors of General Leasing Corporation (later General United Corporation) plaintiff was furnished the Certificate of the Secretary of that corporation that W. J. Wills, President of said corporation, was authorized to sign all written instructions and directions to the transfer agent of the corporation and was also furnished a specimen of the signature of the said W. J. Wills. P. Ex. 6 is a photostatic copy of this certificate and specimen signature.

7. W. J. Wills, President of General United Corporation, presented to the plaintiff's representative in the trust department at its regular place of business a certificate that at a special meeting of the Board of Directors of General United Corporation, Inc., held July 24, 1963, the following resolution was unanimously adopted:

RESOLVED, that Merchants-Produce Bank, the Transfer Agent and Registrar of this corporation, be and it is hereby authorized and directed to issue one hundred thousand (100,000) shares of the common stock of this Corporation to Midwest Funding Company, a Missouri corporation.

P. Ex. 7 is a photostatic copy of this certificate.

7a. P. Ex. 7 (the certified resolution reciting that the plaintiff was authorized to issue the 100,000 shares of stock to Midwest Funding Company) was presented to the plaintiff on July 24, 1963. (Tr. 40, 41.) This certificate was in the plaintiff's hands when the stock was issued on July 24, 1963. (Tr. 41.)

7b. W. J. Wills was the only one from General United whom plaintiff dealt with and during all the period of time prior to July, 1963, he had never done or caused to be done anything that caused the bank to question or doubt him. (Tr. 70.)

7c. At the time the stock was issued to Midwest Funding, Mr. Willis made no statement of any kind concerning the stock other than to present the certified copy of the resolution (Exhibit 7). (Tr. 72.)

8. P. Ex. 8 is the minutes of the meeting of the Board of Directors of General United Corporation, Inc., held July 24, 1963, and P. Ex. 9 is the Escrow Agreement and Exhibits A, B, and C, referred to in these minutes.

9. Plaintiff issued and delivered to W. J. Wills 100,000 shares of stock and he receipted for the same and delivered them to Roger Guffey. P. Ex. 32 is photostatic copies of these certificates. These certificates were delivered to Mr. W. J. Wills by the plaintiff and P Ex 10 is his receipt for the same.

9a. In directing the issuance of the stock of Midwest Funding Company, plaintiff relied upon the recital in the resolution that it was authorized to issue the stock. (Tr. 42.)

9b. The officer of the plaintiff who supervised and directed (Tr. 39) the issuance of the stock certificate to Midwest Funding Company did not know that the stock had been paid for by a promissory note, was not to bear dividends, that it was unregistered and was sold under the terms of an investment letter. (Tr. 42, 43.)

9c. If the facts set out in finding 9b had been known, this officer of the plaintiff would have contacted the corporate attorney of General United Corporation, Inc., and would have asked him for a letter stating that it was proper to issue the stock and he would also have contacted plaintiff's own attorney with relation to issuing the stock. If plaintiff had been aware of these facts (those set out in finding 9b) it would have made inquiry concerning Midwest Funding. (Tr. 44.)

9d. Later, after suit had been brought against plaintiff by Landeene, in 1964, plaintiff did check into Midwest Funding Company and then learned that its president was a disbarred attorney and that it had several problems with the law elsewhere. The financial standpoint of the company then appeared negligible. (Tr. 45, 46.) It also later contacted its own counsel in November, 1963, and this contact resulted in a letter being directed to all of the then holders of the Midwest stock that upon its surrender it would be stamped to show it was unregistered. (Tr. 47, 104–105, DE 14.)

9e. The plaintiff would not have issued the stock had it known all the facts as disclosed by the minutes of the Board of Directors meeting. (Tr. 45, 53.)

10. Later and on or about September 3, 1963, plaintiff, upon surrender to it of stock certificates of General United Corporation for 38,000 shares of stock previously issued as aforesaid to Midwest Funding Company, transferred as direct-ed 9,500 shares of said stock to each of the following: Victor D. Blakely, Alfred A. Wolfgang, Howard F. Landeene and W. J. Wills. P. Ex. 33 is a letter to plaintiff enclosing certificates for this transfer. The first three named later acquired the 9,500 shares issued to W. J. Wills.

11. On April 1, 1964, a suit was instituted against plaintiff by the said Victor D. Blakely, Alfred A. Wolfgang, and Howard F. Landeene in the Circuit Court of Jackson County, Missouri, which suit was numbered 659446.

11a. The petition in this and the other cases filed against plaintiff hereinafter referred to charged the stock had been improperly issued in that it was not marked to show restrictions as to its alienability which resulted in the plaintiffs, in the first case, paying $76,000 for part of the stock. (P. Ex. 11).

12. Plaintiff was served with process in said suit on April 9, 1964. P. Ex. 11 is a copy of the summons and a copy of the petition in the case referred to in paragraph 11.

13. The defense of said suit was immediately tendered under its bond to the defendant.

14. Defendant commenced an investigation of this suit and P. Ex. 12, a letter dated April 28, 1964, has attached to it a copy of the transcript of a statement taken by defendant from plaintiff's trust officer. The defense of the suit was assumed by defendant in accordance with the contents of its attorney's letter dated May 15, 1964, identified as P. Ex. 13, and the contents of that letter contained the terms and provisions of defendant's assumption of the defense; the acceptance of this defense was made by plaintiff through its attorney's letter dated May 19, 1964, and identified as P. Ex. 14.

15. On May 20, 1964, defendant made demand upon General United Corporation, Inc., to pay all costs and expenses incurred as a result of the lawsuit described in paragraph 11 and to pay any judgment that might be rendered against

the bank by reason thereof. A copy of this demand has been identified as P. Ex. 15.

16. On May 20, 1964, defendant filed its motion to dismiss the lawsuit described in paragraph 11. A copy of this motion is attached to P. Ex. 16, a letter from defendant's attorney to plaintiff's attorney.

17. On June 1, 1964, defendant wrote plaintiff a letter that it was withdrawing from the defense of the lawsuit mentioned in paragraph 11 above. A copy of this letter has been identified as P. Ex. 17.

18. P. Ex. 18, P. Ex. 19 and P. Ex. 20 are correspondence between plaintiff and defendant.

19. An amended petition was filed in the suit previously referred to and a copy of that pleading has been identified as P. Ex. 24. P. Ex. 25 is the answer the bank filed to this amended petition.

20. P. Ex. 21, P. Ex. 22 and P. Ex. 23 is correspondence concerning a claim against General United Corporation, Inc.

21. A third-party petition was filed in the suit previously referred to by plaintiff against defendant. Defendant moved the court to dismiss this third-party petition and this motion was sustained. P. Ex. 26 is a copy of the third-party petition and P. Ex. 27 is a copy of defendant's motion to dismiss. P. Ex. 28 is a copy of the Judge's letter sustaining the motion to dismiss the third-party petition.

22. After Case No. 659446 had been prepared for trial and shortly before it was to be called for trial, plaintiff compromised and settled the same for $25,000 and took a general release from the claimants. P. Ex. 29 is a copy of this release and P. Ex. 30 is a copy of a stipulation dismissing the case.

23. In the preparation of the defense of said suit plaintiff incurred and paid attorneys' fees of $11,000 and court costs and other expenses of $726.16.

24. The reasonableness of the $726.16 stated in Item 23 is admitted.

25. Plaintiff has paid $770 to Norman Hem and $6,000 to Harold W. Brown in settlement of their suits, the claims in each of which were similar to the claims made in Case No. 659446 referred to above, and their cases have been dismissed. The said settlement and amounts are included in the Amended and Supplemental Complaint.

26. Plaintiff paid a total attorneys' fee in the Hem and Brown cases of $2,060 and other expenses of $150.30, but the reasonableness of these figures and the settlement amounts paid are not admitted. They are included in the Amended and Supplemental Complaint.

26a. The settlements described above totaling $31,770 were for approximately $33\frac{1}{3}\%$ of the amount claimed and the plaintiff in making such settlements acted properly and reasonably. (Tr. 113.)

26b. The fees described above paid by the plaintiff to its attorneys totaled $13,060 of which approximately $1,000 was for the prosecution of the third-party complaint against the defendant in the state court action. The balance, $12,060, was incurred in defending the plaintiff against the claims made as a result of its issuing the stock to Midwest Funding Company. These fees were necessarily incurred and were fair and reasonable. (Tr. 109–110, 114, 115.)

26c. In addition to such fees plaintiff incurred and paid further expenses of $726.16 and $150.30 (Tr. 115) for a total of $876.46 as a result of the claims made against it and such expenses were necessarily incurred and were reasonable. (Tr. 16 and 115.)

## II.

### Conclusions of Law

Included in the losses covered by the bond was "B": "Any loss of property through robbery, burglary, common law or statutory larceny, theft, *false pretenses* * * * whether effected with or without * * * negligence on the part of any of the employees * * *" and "D": "Any loss (1) through trans-

ferring * * * any funds or property * * * on the faith of any written instructions or advices directed to the Insured and authorizing * * * the transfer * * * of funds or property which instructions or advices * * * *have been altered* without the knowledge and consent of such * * * banking institution," and "E": "Any loss through the Insured's having in good faith and in the course of business * * * in any * * * capacity * * assumed any liability, on the faith of * * * written instructions which prove to have been * * * *altered.*" The bond also provided that the defendant would indemnify the plaintiff against court costs and reasonable attorneys' fees incurred and paid in defending suits on account of any loss covered by the bond.

Plaintiff contends that it is entitled to recover under all three clauses. Because plaintiff bank cites and relies only on cases construing clause "B" and because defendant is clearly liable under that clause, it is unnecessary to discuss whether defendant might also be held liable under clauses "D" and "E". Compare the approach of the Supreme Court of Missouri in Jefferson Bank & Trust Co. v. Central Surety & Ins. Co., Sup.Ct. of Mo., Div. 2, 1966, 408 S.W.2d 825 at 829.

Both parties cite and rely upon Fidelity and Casualty Company v. Bank of Altenburg (8th Cir. 1954), 216 F.2d 294; National Bank of Paulding v. Fidelity & Casualty Co. (S.D.Ohio, 1954), 131 F. Supp. 121, and Jefferson Bank & Trust Co. v. Central Surety & Ins. Co., *supra,* in regard to the "B" coverage question.

All three of those cases held that under the circumstances presented in each the respective plaintiffs were entitled to recover. Plaintiff also cites and relies upon Hartford Acc. & Indem. Co. v. Federal Deposit Ins. Corp. (8th Cir. 1953), 204 F.2d 933, upon which *Bank of Altenburg* is based, and upon St. Lawrence County Nat. Bank v. American Motorists Ins. Co., 21 A.D.2d 702, 249 N.Y.S.2d 543 (App.Div.3d Dep't.1964), which follows and applies the principles enunciated in *Bank of Altenburg*. Plaintiff in that case recovered for a loss under coverage "B" for liability incurred by plaintiff to a New York town whose funds had been misappropriated by a town supervisor who diverted the town's funds to his own personal use.

The defendant cites several cases in addition to those jointly cited by plaintiff, but the only case cited by defendant involving a construction of a Bankers Blanket Bond which is not also cited and relied upon by plaintiff is State Bank of Poplar Bluff v. Maryland Casualty Co. (8th Cir. 1961) 289 F.2d 544. That case, however, related only to claims based on coverage under clause "D" and clause "E". That case did not involve or discuss coverage afforded by clause "B". It therefore cannot be said to be inconsistent with the rules enunciated in *Bank of Altenburg* and the other cases which specifically treat with the scope of clause "B" coverage.

V.A.M.S. § 561.370, entitled *"Obtaining money, goods, by False Pretenses,"* comes into play in this case only to the extent that same section was considered in the *Bank of Altenburg* case.[1] In that case Judge Collet assumed for purposes

---

1. In a rare instance of mistake, the Cumulative Annual Pocket Part of Vernon's Missouri Statutes Annotated states on p. 88 that Sections 561.350–561.390 (which would include Section 561.370) were repealed by "Laws 1955, p. 505, § A." S.B. 23 is published on page 505 of the Laws of Missouri 1955. § A of S.B. 23, approved May 26, 1955, however, shows that Section 561.370 was not repealed by that act.

S.B. 27, approved June 22, 1955, and published on page 507 of the Laws of Missouri 1955, however, shows in § A of that act that Section 561.370 was repealed by S.B. 27 which enacted five new sections relating to the same general subject of stealing and obtaining property by means of deceit which had formerly been covered by Section 561.370 and some fifty odd other statutes.

of decision that "the term 'false pretenses' used in the bond must be given the same technical meaning in which the term is used in the Missouri statute defining that criminal offense" (216 F.2d at 302). He clearly stated, however, that "we do not recommend that assumption" and pointed out that such assumption could, however, be made in *Bank of Altenburg* because, in any event, "the scheme practiced did fall within the Missouri statutory definition of 'false pretenses'"

As a second and independent ground for decision, however, the *Bank of Altenburg* case accepted the construction placed on "false pretenses" in the earlier Brazeau Bank case, reported as Hartford Acc. & Indem. Co. v. Federal Deposit Ins. Corp., *supra*. That earlier case, independent of any Missouri statute, concluded that the "check kiting" scheme that caused the losses to both the Bank of Altenburg and to the Brazeau Bank were "directly caused by false pretenses and [were] within the coverage of the bond." (216 F.2d at 303). In *Bank of Altenburg*, the court explicitly stated that "we adhere to the opinion there expressed [concerning "B" clause coverage independent of reference to any statutory language] and supplement our former expression [in Hartford Acc. & Indem. Co., v. Federal Deposit Ins. Corp.] by now further holding that the conduct practiced on plaintiff herein not only constituted false pretenses under the ordinary meaning of the term but also constituted false pretenses under the Missouri statutory definition of the criminal offense." Section 561.370 was the statute to which the court made reference.

Jefferson Bank & Trust Co. v. Central Surety & Ins. Co. (Sup.Ct. of Mo., Div. 2, 1966), 408 S.W.2d 825, is the most recent applicable Missouri case. The Supreme Court of Missouri relied solely on the Hartford Acc. & Indem. Co. v.

Federal Deposit Ins. Corp., in making its determination that "the acts complained of do amount to false pretenses on the premises which fall within coverage B of the bond." The Supreme Court of Missouri made no reference whatsoever to the language of any Missouri statute.

Brede Decorating, Inc. v. Jefferson Bank & Trust Co. (Sup.Ct. of Mo., Div. 2, 1961), 345 S.W.2d 156, establishes that the loss which *Jefferson Bank & Trust Co.* later held to be within the coverage of clause B was the amount of the judgment rendered in favor of the bank's corporate depositor whose funds had been diverted to the personal use of an officer of the corporation. The Supreme Court of Missouri determined that the circumstances involved in a series of transactions, which, when taken together with all the other facts and circumstances, were sufficient to support "the ultimate fact that the bank was legally put upon inquiry to determine whether the corporation had authorized these acts" (345 S.W.2d at 162). Liability was predicated upon the finding that "any reasonable inquiry * * * would have disclosed that these transactions were diversions of corporate funds and unauthorized" (345 S.W.2d at 163).

It is obvious that the question of whether or not the "false pretense" language of clause "B" covers a particular loss is not at all dependent upon whether the conduct of the person who causes the loss to the bank may or may not be said to have violated a false pretense criminal statute of a particular state.

It is also obvious that the defendant's contention that it is legally significant that the actions brought against the plaintiff bank may have sounded in negligence is not tenable. Liability in Hartford Acc. & Indem. Co. v. Federal Deposit Ins. Corp., *supra*, as in Jefferson Bank & Trust Co. v. Central Surety & Ins. Co., *supra*, and as in St. Lawrence

---

The fact that Section 561.370 was repealed in 1955 does not, of course, affect the decision of this case; a bank may be victim of false pretenses regardless of whether the acts which constitute false pretenses may or may not violate a specific criminal statute.

County Nat. Bank v. American Motorists Ins. Co., *supra*, all involved cases in which "B" coverage was adjudicated without reference to the nature of the cause of action asserted by a third party against the bank. Indeed, in the latter two cases, the loss was determined as a result of lawsuits successfully maintained against the respective banks on legal theories not dissimilar to the theories asserted by the third parties against plaintiff bank in this case. The basis of the banks' liability in cases cited was not viewed as being significant in connection with the later action by the bank against the bonding company. What was deemed significant was whether or not the bank's actions had been induced by false pretenses as those words are commonly understood without reference to any criminal statute.

We must recognize, however, that liability under clause "B" in *Bank of Altenburg* was based on a second separate and independent ground and that we should make the same assumption in this case which the Court of Appeals made in that case. *Bank of Altenburg* held, first, that the bank's loss caused by the "check kiting" conduct of Mr. Schneier "constituted false pretenses under the ordinary meaning of the term" (216 F.2d at 303), a ground originally articulated in its earlier decision in Hartford Acc. & Indem. Co. v. Federal Deposit Ins. Corp. case. Secondly, however, the court based its decision on a new and second ground by stating that "the conduct practiced on plaintiff * * constituted false pretenses under the statutory definition of the criminal offense" (216 F.2d at 303).

The opinion in *Bank of Altenburg* makes clear that the conduct directed against the bank involved "a series of acts which together constitute a scheme, a studied device, false pretenses built upon a series of false representations designed to lull the banks involved into a feeling of confidence and security." The court explicitly held that "the practice is a false pretense under § 561.370, * * *" (216 F.2d at 303).

Defendant contends that "the statutory violation for false pretense in Missouri is contained in [V.A.M.S.] Section 561.450," a section of the Missouri statutes also mentioned in *Bank of Altenburg*. That statute is entitled *"Confidence game or fraudulent checks—penalties."* While Section 561.450 was mentioned in *Bank of Altenburg*, it is apparent that it was mentioned only because under the particular facts of that case, the false pretenses practiced on the plaintiff happened to involve the use of checks. The Court made a definitive finding that the overall conduct practiced on the bank was a "false pretense" within the meaning of Section 561.370, and then added, more or less as a still further circumstance, that the practice of check kiting could also be said to be a violation of Section 561.450. We believe the court made this clear when it stated that "the mere fact that the giving of a check with insufficient funds in the bank to meet it is one of a series of acts constituting the false pretense or the trick, device, or game, does not take the practice of 'check kiting' out of the definition of the offenses defined by § 561.370 or § 561.-450."

Defendant's contention that Section 561.450, rather than Section 561.370, should be looked to for a statutory definition of false pretenses is not tenable. All the cases separately cited by the defendant involve Section 561.450, not Section 561.370, prosecutions.[2] Those Section 561.450 cases simply are not apposite. Defendant does not cite a single Section

---

2. The Section 561.470 prosecution cases which defendant cites and upon which it improperly relies are State v. Weber, (Sup.Ct. of Mo., Div. 1, 1957) 298 S.W. 2d 403; State v. Fields, (Sup.Ct. of Mo., Div. 2, 1963) 366 S.W.2d 462; and State v. DeClue, (Sup.Ct. of Mo., Div. 2, 1966) 400 S.W.2d 50. We have considered the defendant's only other cited case, Duncan v. Kelly, (K.C.Ct. of Mo.App.1968) 435 S.W.2d 29 (a breach of contract case) and conclude that it is equally inapposite.

561.370 case other than *Bank of Altenburg*. That case, as we have held, sustains plaintiff's contention.

In the final analysis, *Bank of Altenburg* must be said to establish the principle that a loss to a bank is covered by clause "B" of a Bankers Blanket Bond if the conduct practiced upon the bank constituted "false pretenses" either (a) within the meaning of that term as defined in V.A.M.S. Section 561.370; or (b) within the ordinary meaning of that term. Application of that principle to the factual situation presented in a particular case must also apply the rule stated by the Supreme Court of Missouri in Jefferson Bank & Trust Co. v. Central Surety & Ins. Co., *supra*, in regard to "the kinds of losses which the bond covers" (408 S.W.2d at 830). That Missouri case made clear that the losses covered by a Bankers Blanket Bond fall into "two categories." In that regard it stated:

> One is where the bank suffers a direct loss of its money or property for any of the causes mentioned in the bond, such as by theft. The other is where the bank does not suffer a direct loss *but incurs a liability* and as a result thereof has to pay money to another on account of a risk covered. [408 S.W.2d at 830] (Emphasis ours).

The "liability" incurred and held to be covered in *Jefferson Bank & Trust Co.* was established from the judgment recovered against it in the earlier *Brede Decorating, Inc.* case. The same situation was present in St. Lawrence County Nat. Bank v. American Motorists Ins. Co. In this case, the plaintiff bank was successful in reducing the amount of its loss by settling the lawsuits which had been brought against it. The fact those lawsuits were settled does not mean that there was no "liability" within the coverage of the bond. The question of coverage turns on whether or not the conduct practiced on plaintiff bank and the series of acts thereafter produced must be said to constitute false pretenses within the meaning of clause "B" of the Bond. We find and conclude that they do.

It is not necessary to state all of the series of circumstances which resulted directly from the presentation by Mr. Wills of only a part of the corporate action taken by General United Corporation at its July 24, 1963 meeting. Regardless of whether we consider that only one of three paragraphs of single corporate resolution was presented, or whether only one of three separate resolutions was presented, it is clear that Mr. Wills, undoubtedly with the approval, and perhaps even at the suggestion of Mr. Ruth, intentionally concealed and failed to advise plaintiff bank that General United Corporation had authorized a great deal more corporate action than merely the routine issuance of 100,000 shares of its stock to Midwest Funding Company.

Nothing whatever was said about the fact the stock had been paid for by a promissory note, that it was not to bear dividends, or that it was unregistered and was sold under the terms of an investment letter. The testimony is undisputed that if those facts had been made known to plaintiff bank it would have been placed on inquiry and that, in any event, it would not have issued the stock had it known all the facts disclosed by a complete copy of the July 24, 1963 minutes of the Board of Directors of General United Corporation. There can be no doubt that plaintiff bank relied upon what it was told and that Mr. Wills' failure to disclose the full factual situation caused the bank to act as it did.

It is not necessary to make findings concerning the degrees of complicity that existed between Mr. Wills, Mr. Ruth, and the escrow agent who acted under their domination. It is clear that the escrow agreement was honored by its consistent breach and that the escrow agent consistently acted, for the most part, under oral rather than written instructions.

All the facts and circumstances warrant a finding that the conduct of the escrow agent was contemplated at the outset and that Mr. Wills' knowingly concealed and withheld material information from the bank when he failed to ad-

vise the bank even of the existence of an escrow agreement. We so find.

We rather doubt whether either Mr. Wills or the escrow agent had any knowledge of Mr. Ruth's apparently unsavory past at the time they became associated with him. But there can be no doubt that Mr. Wills was seeking desperately to raise corporate funds to meet a past due loan of $152,900 owed plaintiff bank. Nor is there any doubt that he, as an officer, was in dire straits to raise adequate working capital for General United Corporation (see Df. Exh. 9, Wills' Deposition, p. 24). Although Mr. Wills was relying heavily upon and dealing almost exclusively with Mr. Ruth at the time, he never advised plaintiff bank of any of the "transactions then going on with Mr. Ruth" or "of the deals that [he] hoped Mr. Ruth would become instrumental in making" (Ibid, pp. 20, 24, 25). Mr. Wills accurately described the consequences that flowed from his initial misrepresentation to plaintiff bank by stating that through "Mr. Ruth and through Mr. Guffey, the shares had gotten out of control of the escrow agreement" and that "the original Midwest Funding transaction got into a category * * * that those shares ended up in various people's hands that were not aware of their origin." He accurately stated "that is the sum and substance of the whole situation" (Ibid. pp. 39, 53).

We need not trace all of the complicated transactions in which various shares of the stock became involved. It is sufficient to say the persons who filed suit against the bank predicated their claims upon grounds not dissimilar from those asserted by the plaintiff in Brede Decorating, Inc. v. Jefferson Bank & Trust Co., *supra*.

Defendant agreed to "indemnify the Insured against court costs and reasonable attorneys' fees incurred and paid by the Insured in defending against any suit or legal proceeding brought against the Insured to enforce the Insured's liability or alleged liability on account of any loss, claim or damage which, if established against the Insured, would constitute a valid and collectible loss sustained by the Insured under the terms of this bond." We find and conclude that the claims of the persons who brought suit against plaintiff bank brought actions which, if they had been established, would have constituted a valid and collectible loss under clause "B" of the bond.

We further find and conclude that the fact that such suits were settled did not relieve the defendant from liability. Defendant has not, and can not properly under the circumstances of this case, contend that plaintiff did not make an appropriate settlement of the litigation. It did not even attempt to introduce any evidence in that regard. Defendant simply contended that the loss was not covered. That contention, for reasons we have stated, is not tenable.

Defendant makes some contention that the evidence does not support findings in regard to Mr. Wills' "intent to cheat and defraud," in regard to whether plaintiff bank actually relied upon the false pretenses, and whether the false pretenses were the effective cause which induced plaintiff bank to act as it did. We have, of course, made findings contrary to defendant's contention.

Reference to Judge Danaher's opinion in Nelson v. United States (1955), 97 U.S.App.D.C. 6, 227 F.2d 21, 53 A.L.R. 2d 1206, shows that a failure to disclose full and accurate information to a bank supports false pretense criminal conviction under a statute substantially similar to V.A.M.S. § 561.370. That case applied principles stated in Agnew v. United States, 165 U.S. 36, 53, 17 S. Ct. 235, 41 L.Ed. 624 (1897), and Pence v. United States, 316 U.S. 332, 339, 62 S.Ct. 1080, 86 L.Ed. 1510 (1942). What is said in *Nelson* and the two Supreme Court cases cited is applicable here. We so hold.

In light of the *Jefferson Bank* cases in the Supreme Court of Missouri and the *Brazeau* and *Altenburg Bank* cases in the Eighth Circuit, we find it difficult to

see how the words "false pretenses" as used in clause "B" can be said to be ambiguous when the loss occurs in Missouri. In accordance, however, the implicit direction of the recent Eighth Circuit case of American Ins. Co. v. First Nat. Bank in St. Louis (8th Cir. 1969), 409 F.2d 1387, 1390, we conclude, in the language of that case, that:

> If contrary to what we have said, any ambiguity exists, support for the conclusion we reach is found in the well established Missouri rule to the effect that where the meaning of a policy provision is doubtful and the language thereof is susceptible of different constructions, the courts must adopt the construction most favorable to the insured.

Massachusetts Bonding & Insurance Co. v. Feutz (8th Cir. 1950), 182 F.2d 752, 756, cited and relied upon by Judge Hulen in Federal Deposit Ins. Corp. v. Hartford Acc. & Indem. Co. (E.D.Mo. 1952), 106 F.Supp. 602, 603, pointed out that the long established rule of construction recently restated in American Ins. Co. v. First Nat. Bank in St. Louis, *supra*, rests upon the circumstance that a bonding company is a "compensated surety," and hence is subject to the rule that "in the construction or interpretation of the contract of such a surety the contract is construed most strongly against the surety and in favor of the indemnity." (182 F.2d at 756.)

Clause "B" of a standard Bankers Blanket Bond covers losses of property occasioned not only by false pretenses but also by robbery, burglary, common law or statutory larceny, theft, hold-up, misplacement, mysterious unexplained disappearance, damage thereto or destruction thereof. That exceedingly wide coverage is further broadened by the provision in clause "B" which establishes liability for the loss "whether effected with or without violence or with or without negligence on the part of any of the employees."

The term "false pretenses," like the term "fraud," is a broad generic term that is used in many and various senses. Those terms may not be given any all-embracing definition but are to be understood, both within their ordinary meaning and within the meaning of various criminal statutes, to cover the varied facts and circumstances peculiar to individual cases. The article on Fraud and Deceit, 37 Am.Jur.2d § 1, p. 18, appropriately states that "the fertility of man's invention in devising new schemes of fraud is so great that courts have always declined to define it. * * * It is, indeed, said that it is better not to define the term lest the craft of man should find ways of committing fraud which might evade such a definition." The refusal of the Eighth Circuit to be tied to the definition of false pretenses as contained in Section 561.370 as the sole meaning of that term as used in clause "B" reflects an application of that consideration.

It is therefore obvious that the term "false pretenses" covers a very broad spectrum of human activity as do the other terms included in clause "B". Clause "B" undertakes to indemnify against many forms of the craftiness and chicanery of man. Courts must and do assume that a bonding company is familiar with the long-standing rules of construction applicable to a compensated surety in the law of a particular State and that the premiums it charges for the exceedingly broad coverage provided in clause "B" takes into account and are commensurate with the risks incident to losses that may, from an actuarial viewpoint, be occasioned by the wide variety of facts and circumstances that may be held to be covered.

It does not make sense for a compensated surety to refuse to comply with its bond obligations simply because some court has not yet been required to adjudicate coverage under false pretense factual circumstances which are precisely the same as those presented in connection with a particular claim. The methods under which scheming individuals may conceal and withhold and thereby misrepresent factual circumstances to induce

banks to take action are much too varied to permit such a view. Statutes permitting assessment for vexatious delay reflect public impatience with compensated sureties who fail to recognize that the general principles established by the adjudicated cases are applicable to an almost unlimited variety of factual circumstances which would, if put to the test, be judicially determined to constitute false pretenses within the meaning of clause "B" of a Bankers Blanket Bond.

For the reasons stated, plaintiff is entitled to recover of and from the defendant under clause "B" of the bond the total of the amount it paid in settlement of Case No. 659,446, i. e., $25,000; the sum it paid to Harold W. Brown, i. e., $770; the sum it paid to Norman Hem, i. e., $6,000; its attorneys fees of $12,000; and its other expenses of $876.45, for a total of $44,646.45.

Plaintiff's counsel shall within five (5) days prepare an appropriate final judgment, submit the same to defendant's counsel for approval as to form, and thereafter present the same to the Court.

It is so ordered.