**COLUMBIA UNION NATIONAL BANK,**
**Third–Party Plaintiff,**

v.

**HARTFORD ACCIDENT & INDEMNITY**
**COMPANY, Third–Party Defendant.**

No. 19899–1.

United States District Court,
W. D. Missouri, W. D.

Sept. 18, 1980.

**1264**

Daniel M. Dibble, Lathrop, Koontz, Righter, Clagett, Parker & Norquist, Kansas City, Mo., for third–party plaintiff.

Paul Scott Kelly, Jr., Gage & Tucker, Kansas City, Mo., for third–party defendant.

## MEMORANDUM OPINION AND ORDERS

JOHN W. OLIVER, Chief Judge.

This is an ancillary action for attorneys' fees, costs, and penalties for vexatious refusal to defend. The case currently pends on cross motions for summary judgment based on the meld of undisputed facts filed June 17, 1980.

Third–party plaintiff, Columbia Union National Bank [hereinafter Columbia Union] seeks recovery under the terms of a Bankers Blanket Bond issued by third–party defendant, Hartford Accident and Indemnity Company [hereinafter Hartford]. Columbia Union alleges that Hartford wrongfully refused to defend plaintiff bank against claims asserted by the Trustee in Bankruptcy in the plenary action entitled *Jackson v. Star Sprinkler Company*, No. 19899–1.

The plenary action, *Jackson v. Star Sprinkler Corp. of Fla.*, reported at 575 F.2d 1223 (8th Cir. 1978), was brought by the trustee in bankruptcy of Great Western Automatic Sprinkler Company and Fabrication and Supply Company to recover assets later held fraudulently transferred by certain defendants in that case. The underlying facts of this litigation are set forth in that opinion at 1226, *et seq.*, and need not be fully recited here.

### I.

#### *Findings of Fact*

The Court incorporates by reference the meld of undisputed facts filed by the parties June 17, 1980 and makes the following findings based primarily on that stipulation. Because the meld of undisputed facts simply refers to the insurance contract by exhibit number, the relevant parts will be quoted herein for easy reference. We shall also summarize the allegations of the trustee's complaint. All other findings of fact are as stipulated by the parties unless clearly indicated in the text.

1. This is an action for attorneys' fees, costs and vexatious refusal to defend brought by third–party plaintiff Columbia Union National Bank ("Columbia Union") against third–party defendant Hartford Accident and Indemnity Company ("Hartford"). The cause of action is brought pursuant to Paragraph D of the general agreements Section and Coverage B of the Insuring Agreements of a Banker's Blanket Bond dated September 12, 1969, between Hartford and Columbia Union, which was in effect according to its terms and conditions in 1970 and 1971. (Meld # 1)

2. The insuring agreement, in relevant part, provides that with respect to loss sustained by the insured at any time but discovered during the bond period, and subject to other terms and conditions of the bond, the insurer will indemnify and hold harmless the insured for:

ON PREMISES

(B) Loss of Property (occurring with or without negligence or violence; through robbery, burglary, common–law or statutory larceny, theft, *false pretenses*, [emphasis added] hold–up, misplacement, mysterious inexplainable disappearance, damage thereto or destruction thereof, and loss of subscription, conversion, redemption or deposit privileges through the misplacement or loss of Property, while the Property is (or is supposed to be) lodged or deposited within any offices or premises located anywhere, except in an office listed in Item 4 of the Declarations or amendment therefor or in the mail or with a carrier for hire, other than an armored motor vehicle company, for the purpose of transportation. (Insurance Contract, Ex. A to Third–Party Plaintiff's First Amended Complaint, Meld # 1)

3. General Agreement D provides:

COURT COSTS AND ATTORNEYS' FEES

(Applicable to all Insuring Agreements now or hereafter forming part of this bond)

D. The Underwriter will indemnify the Insured against court costs and reasonable attorneys' fees incurred and paid by the Insured in defending any suit or legal proceeding brought against the Insured to enforce the Insured's liability or alleged liability on account of any loss, claim or damage which, if established against the Insured, would constitute a valid and collectible loss sustained by the Insured under the terms of this bond. . . . In consideration of such indemnity, the Insured shall promptly give notice to the Underwriter of the institution of any such suit or legal proceeding and at the request of the Underwriter shall furnish it with copies of all pleadings and other papers therein; and at the Underwriter's election shall permit the Underwriter to conduct the defense of such suit or legal proceeding in the Insured's name, through attorneys of the Underwriter's own selection. In the event of such election by the Underwriter, the Insured shall give all reasonable information and assistance other than pecuniary, which the Underwriter shall deem necessary to the proper defense of such suit or legal proceeding. (Insurance Contract, Ex. A to Third–Party Plaintiff's First Amended Complaint, Meld # 1)

4. On November 29, 1971 Robert L. Jackson, Trustee in Bankruptcy for Great Western Automatic Sprinkler Company ("Great Western") and Fabrication and Supply Company ("Fabrication"), filed a complaint in the United States District Court for the Western District of Missouri entitled *Robert L. Jackson, Trustee, v. Star Sprinkler Company, et al.*, naming Columbia Union as a defendant. (Meld # 2)

5. On August 14, 1972, the Trustee filed a First Amended Complaint, naming Columbia Union as a defendant. (Meld # 3)

6. In Count IV of his complaint and First Amended Complaint, the count which is the foundation of Columbia Union's claim against Hartford here, the Trustee made claims against Columbia Union and certain other defendants. For the sake of brevity the allegations are summarized as follows but the complaint as originally filed and as amended is incorporated herein by refer-

ence. In Count IV of the trustee's original complaint it was alleged that certain defendants, not including plaintiff bank, organized High Point of the Midwest, in contemplation of the filing of bankruptcy proceedings for Great Western Automatic Sprinkler Company and Fabrication & Supply Company, to conceal and divert the assets of Great Western and Fabrication to High Point.

The trustee also alleged that defendant High Point established bank accounts at defendant Columbia in which checks payable to the bankrupts were deposited from April to June 8, 1971. He further alleged that the deposits payable to the order of the bankrupts were received *after* bankruptcy and were endorsed and deposited to the account of defendant High Point in accordance with the plan and conspiracy among other defendants, *with knowledge and notice of the bankruptcies acquired by Defendant Columbia no later than May 7, 1971.*

In the original complaint the trustee prayed for relief from defendant Columbia Union as follows:

That Plaintiff have and recover such sum as is determined to represent the amount of checks and other legal instruments payable to the order of the bankrupts, endorsed and deposited to the accounts of Defendant High Point *after actual knowledge* [emphasis added] of the said bankruptcy proceedings was acquired by Defendant Columbia, less such amount as may be recovered by Plaintiff under judgment granted pursuant to Count V of this Complaint.

The first amended complaint filed August 14, 1972 alleges basically the same scheme among other defendants, and with respect to Columbia Union, seeks recovery for transfers after bankruptcy void against the trustee pursuant to § 70(d) of the Bankruptcy Act, 11 U.S.C. § 110(d). (Trustee's original and amended complaints)

7. The series of letters exchanged between counsel for Columbia Union and counsel for Hartford as set forth in the parties' Meld of Undisputed Facts No. 5 are incorporated herein by reference. (Meld # 5)

8. During the course of discovery, the action by the Trustee against Columbia Union was directed solely to post–bankruptcy transfers which the Trustee sought to recover under § 70(d) of the Bankruptcy Act. The Trustee did not seek recovery from Columbia Union for transfers of property of Great Western prior to Columbia Union's actual knowledge of bankruptcy of Great Western. (Meld # 6)

9. Prior to December 15, 1970, Columbia Union had never done any business with Great Western. Great Western had previously banked at Roeland Park State Bank. (Meld # 8)

10. Robert E. Miller, an insurance agent of Great Western, and his brother, Richard W. Miller, an attorney for Great Western and various of its secured creditors, were friends of Robert W. Wallerstedt, the President of Columbia Union. They had previously gone to school together. (Meld # 9)

11. Robert E. Miller was owed $62,000.00 for insurance premiums from Great Western on December 15, 1970. At that time, he was in an unsecured position and wanted to place himself in a secured position in the event of the bankruptcy of Great Western. (Meld # 10)

12. Robert E. Miller called Robert Wallerstedt to discuss a loan from Columbia Union to Great Western for the purpose of putting Robert E. Miller in a secured position in the event of the bankruptcy of Great Western. Wallerstedt referred Miller to E. H. Bickerton, an executive officer of Columbia Union. Mr. Bickerton met with Miller, who informed Bickerton of his plan to change his status from an unsecured creditor to a secured creditor in the event of Great Western's bankruptcy. In connection with the loan, Bickerton prepared a bank credit memorandum. (Third–Party Def. Ex. No. 1) Robert Miller agreed to arrange to have Great Western grant the bank a security interest in all the assets of Great Western, but pointed out that the security interest would be in a third position behind

a security interest previously given in all Great Western's assets to Star Sprinkler Company and the Philadelphia National Bank. (Meld # 11)

13. On or about December 15, 1970, Columbia Union made a loan of $62,000.00 to Great Western. Although the loan was made to Great Western, the proceeds of the loan were paid in a cashier's check to Robert E. Miller and Great Western jointly. Great Western endorsed the check in satisfaction of the premium debt due Miller from Great Western. Miller personally guaranteed the loan and then purchased a certificate of deposit from Columbia Union in the amount of $62,000.00 with the proceeds of the cashier's check. He pledged the certificate of deposit as security for his personal guaranty. Consequently, the proceeds of the loan never left the bank and were in effect pledged as security for the loan. According to the plan, if Great Western did go into bankruptcy, the bank would call on Miller's guaranty. Miller would then pay the loan with the proceeds of the certificate of deposit and step into Columbia Union's position as a secured creditor holding a third position behind Star Sprinkler Company and Philadelphia National Bank. (Meld # 12)

14. A security agreement was drafted by the bank or its attorney in favor of Columbia Union with respect to the $62,-000.00 loan to Great Western. In drafting its security agreement the bank used the security agreement between Star Sprinkler Corporation and Great Western, Fabrication and MAR Leasing Company, dated July 14, 1970. Robert Miller had given the Star security agreement to Bickerton after Miller had obtained it from his brother, Richard W. Miller, an attorney for Star and Great Western. (Meld # 13)

15. In the normal business practice Columbia Union expected business checking accounts to arise out of loans made by Columbia Union to businesses or corporations. (Meld # 14)

16. Roy Groves became employed as controller of Great Western in March, 1971. At that time Richard Miller explained the security agreement between Great Western and Star Sprinkler to him. Miller further explained to Groves that the secured creditors of Great Western had taken over the assets of Great Western and would be completing the Great Western contracts. When he became employed with Great Western, Groves discovered that the financial condition of the company was extremely poor. (Meld # 15)

17. He also discovered that Great Western was indebted to Columbia Union on the $62,000.00 loan involving Robert Miller. (Meld # 16)

18. At a special meeting of the board of directors of Great Western on April 2, 1971, Roy Groves was elected Assistant Secretary of Great Western. As Assistant Secretary, Roy Groves was fully authorized by Great Western to endorse checks which were payable to Great Western and to write checks upon Great Western accounts. (Meld # 17)

19. On April 15, 1971 High Point of the Midwest was incorporated in Missouri for purposes of engaging in the business of installing fire protection sprinkler systems with the powers set forth in its Articles of Incorporation. Thereafter, High Point held itself out as a successor to Great Western. (Meld # 18)

20. On April 26, 1971, Star Sprinkler assigned its security interest [in] the assets of Great Western to High Point. Roy Groves was advised of and knew of the assignment of the security agreement from Star to High Point. After April 26, 1971, Groves acted as the controller for both High Point and Great Western. (Meld # 19)

21. Shortly before April 27, 1971, Richard W. Miller spoke with Robert W. Wallerstedt, either in person or by telephone, to inform him that Star Sprinkler Corporation, pursuant to its security agreement, had taken possession of the assets of Great Western, had assigned its security agreement to High Point and was going to liquidate the Great Western assets. Miller testified that he told Wallerstedt that High Point had been formed by Star Sprinkler for the purpose of liquidating the contracts of Great

Western and that Miller was interested in establishing a bank account at Columbia Union for High Point. Miller testified that the purpose of the Columbia Union account was to deposit the proceeds of Great Western contracts and to write checks for the completion of those contracts. Columbia Union denies that it knew of this purpose prior to bankruptcy. (Meld # 20)

22. Miller testified that he reminded Wallerstedt at the meeting that Columbia Union was a secured creditor of Great Western because of the loan which Columbia Union had made to Great Western and which was guaranteed by Miller's brother, Robert E. Miller. (Meld # 21)

23. Wallerstedt told Miller that Columbia Union would be pleased to have the account of High Point and then referred Miller to Ed Bickerton, the officer who previously handled the Robert Miller loan. (Meld # 22)

24. Immediately thereafter, Miller gave blank signature cards to Roy Groves, along with the blank standard bank resolution, and instructed Roy Groves to open a bank account on behalf of High Point at Columbia Union. (Meld # 23)

25. On April 27, 1971 Ed Bickerton and Roy Groves met on the premises of Columbia Union for approximately 45 minutes before the High Point account was opened at Columbia Union. (Meld # 24)

26. When Roy Groves met with Ed Bickerton at Columbia Union to open the High Point account, he had with him the signature cards, standard bank resolution executed by High Point, as well as the checks making up the initial deposit and an adding machine tape of the checks. (Meld # 25)

27. On April 27, 1971 there was in force and effect at Columbia Union a written procedure for opening a checking account that had been prepared by Mrs. Pamela Molnar. Mrs. Molnar's responsibilities were to open new business checking accounts at Columbia Union at all times except on Saturdays and after banking hours. (Meld # 26)

28. One of the purposes of the written procedure was for the use of officers who would open the checking accounts at those times when Mrs. Molnar was not available. E. H. Bickerton was acquainted with this procedure. (Meld # 27)

29. Because of his familiarity with the background of the High Point account and the prior loan to Great Western for the use of Robert E. Miller, Bickerton became the officer in charge of the account. (Meld # 28)

30. Mrs. Molnar was the person primarily responsible for the operating of new business accounts. Indeed, she knew more about the responsibilities and duties in opening new accounts than most bank officers. (Meld # 29)

31. Mrs. Molnar's responsibilities included receiving and reviewing all checks or other documents making up an initial deposit. It was her duty to see that all checks in an initial deposit were properly endorsed. (Meld # 30)

32. On April 27, 1971 High Point of the Midwest opened checking account No. 03–171–2 at Columbia Union. (Meld # 31)

33. Checking account No. 03–171–2 was opened by Roy Groves. (Meld # 32)

34. On April 27, 1971, when Roy Groves opened account No. 03–171–2 at Columbia Union, he gave the address of High Point of the Midwest as 1544 Howell, North Kansas City, Missouri and its telephone number as HA 1–1574. (Meld # 33)

35. On April 27, 1971, when Roy Groves opened Account No. 03–171–2 in the name of High Point of the Midwest at Columbia Union, he also dealt with Pamela Molnar. (Meld # 34)

36. Mrs. Molnar reviewed the documents and checks making up the initial deposit. (Meld # 35)

37. The opening deposit was in the amount of $40,924.06. Fifteen of the checks making up the opening deposit were payable to Great Western and three were payable to Fabrication. Those checks were endorsed on the reverse side thereof for the purposes of deposit into the High Point account. (Meld # 36)

38. The fifteen checks payable to Great Western that were deposited into Account No. 03–171–2 in the name of High Point on April 27, 1971 bore only the following handwritten endorsement of Roy Groves: "Pay to High Point Sprinkler Co., Roy Groves." (Meld # 37)

39. Two of the checks payable to Fabrication that were deposited in Account No. 03–171–2 opened in the name of High Point on April 27, 1971, bore the following handwritten endorsement of Roy Groves: "Roy Groves, Asst. Secretary." (Meld # 38)

40. One of the checks payable to Fabrication that was deposited in Account No. 03–171–2 opened in the name of High Point on April 27, 1971, bore only the following handwritten endorsement of Roy Groves: "Roy Groves." (Meld # 39)

41. Mrs. Molnar prepared the account cards for Account No. 03–171–2 and for Account No. 03–172–0 on April 28, 1971. She noted on the cards "other accounts" and "others here" which normally means the new customer already had a business relationship with the Bank. (Meld # 40)

42. On April 28, 1971 Roy Groves returned to Columbia Union, bringing with him a resolution from Great Western authorizing him to endorse checks payable to Great Western and deposit them in the High Point account. (Meld # 41)

43. By Board of Directors resolution of Great Western adopted April 6, 1971, Roy Groves was given authority to endorse checks on which Great Western was the payee on the terms and conditions set forth in the resolution. (Meld # 42)

44. Columbia Union obtained formal corporate resolutions respecting Roy Groves' authority to endorse checks as he did. (Meld # 43)

45. Roy Groves was the only natural person to endorse checks payable to Great Western for deposit to Columbia Union Account No. 03–171–2 and he did so for and on behalf of and in his capacity as an officer of Great Western and Fabrication and Supply and High Point Sprinkler Company of the Midwest and such corporate endorsements were authorized. (Meld # 44)

46. Columbia Union requested and received corporate resolutions from High Point of the Midwest regarding Roy Groves' authority to endorse checks on behalf of High Point of the Midwest. (Meld # 45)

47. Roy Groves on April 27, 1971, expressly or impliedly represented to Columbia Union that he was authorized to open the account, endorse the checks payable to Great Western or Fabrication and deposit them to the account of High Point, and draw checks upon the latter account. (Meld # 46)

48. On April 28, 1971, he opened the Account No. 03–172–0 for the purposes of paying the payroll of High Point. (Meld # 47)

49. Columbia Union Account No. 03–172–0 was opened by Roy Groves, Secretary–Treasurer of High Point of the Midwest and Assistant Secretary of Great Western. (Meld # 48)

50. The payroll account was funded on April 28 by transferring $20,000.00 from the previously opened general checking account to the payroll account. Groves received coded checks from Mrs. Molnar on April 28, so that he could pay the payroll of High Point. (Meld # 49)

51. Columbia Union gave High Point immediate credit on the checks deposited in Account No. 03–171–2 by transferring $20,000 to the payroll account on April 28, 1971. The majority of the checks which made up the initial deposit to the general checking account of High Point were drawn on out–of–town banks and normally Columbia Union would not have given credit upon an initial deposit until the checks making it up had cleared. (Meld # 50)

52. All subsequent deposits to Columbia Union Account No. 03–172–0 were transferred thereto from Columbia Union Account No. 03–171–2. (Meld # 51)

53. At the time Roy Groves opened Columbia Union checking account Nos. 03–171–2 and 03–172–0, Columbia Union and knowledge that Great Western was in a serious financial condition. (Meld # 52)

54. At the time Roy Groves opened Columbia Union checking Account Nos. 03–171–2 and 03–172–0, Columbia Union had in its possession the bank credit memorandum prepared December 15, 1970 by E. H. Bickerton with respect to Great Western. (Meld # 53)

55. Prior to April 27, 1971, neither Roy Groves, High Point of the Midwest, High Point of North Carolina nor William F. Aldridge had opened or maintained any type of account at Columbia Union, nor was E. H. Bickerton or any officer of Columbia Union acquainted with Roy Groves or William F. Aldridge. (Meld # 54)

56. After the initial deposit, High Point made all its deposits by mail. Columbia Union employed mail tellers who made deposits received by mail. The vast majority of the checks deposited into the High Point accounts at Columbia Union after April 27, 1971 were payable to Great Western or Fabrication. The Columbia Union mail tellers would review all mail deposits to see that the checks were filled out, signed and properly endorsed. If, in the judgment of the teller, a check was irregularly endorsed, the teller would bring it to the attention of a superior. If, in the judgment of the teller, a check was not irregularly endorsed, the teller would deposit the check to the account of the depositor. The mail tellers did not consider the endorsements upon the checks described in paragraph 49 of the Pretrial Stipulation to be an irregularity they needed to discuss with an officer or superior. (Meld # 55)

57. All checks payable to Great Western other than those comprising the initial deposit that were subsequently deposited in Columbia Union Account No. 03–171–2 opened in the name of High Point of the Midwest bore the following endorsements: "Pay to the Order of High Point Sprinkler of the Midwest, Great Western Automatic Sprinkler Co., Inc., by Roy Groves," "Pay to the Order of Columbia Union National Bank and Trust Co., Kansas City, Missouri, For Deposit Only High Point Sprinkler Co. of the Midwest 03–171–2." (Meld # 56)

58. On April 27, 1971, and at all material times thereafter, mail deposits including those made to Columbia Union account No. 03–171–2 were received by Columbia Union and taken to its Ninth Street Vault for initial processing. (Meld # 57)

59. In the regular course of the business of Columbia Union, a mail teller would then examine the checks to see that they were endorsed and then encode the deposit ticket. (Meld # 58)

60. The mail teller who primarily handled Columbia Union's mail deposits during the time material to this action was Byrrita Slaughter, although others would assist her on occasion. (Meld # 59)

61. At all material times hereto, the mail tellers were under the direct supervision of Warren Schnell, Senior Vice President and Cashier at Columbia Union. (Meld # 60)

62. After the mail teller or tellers performed their work on Columbia Union's mail deposits, the checks were then machine encoded and the amount of the checks were then proofed against the deposit ticket. (Meld # 61)

63. After the checks were encoded, they would be batched and taken to the computer room for sorting and inter–bank processing. (Meld # 62)

64. During an ordinary banking business day, and at all times mentioned herein, deposits were received at Columbia Union for approximately 1,000 accounts, consisting of approximately 5,000 deposit items, totalling $10,000,000 to $15,000,000 so deposited. (Meld # 63)

65. The clerks in the mail deposit room did not have actual knowledge of the bankruptcy of Great Western at any time prior to June 8, 1971. (Meld # 64)

66. From April 27, 1971 to June 4, 1971, $581,199.81 in checks payable to Great Western or Fabrication were deposited in Columbia Union account No. 03–171–2. (Meld # 65)

67. Between May 3, 1971 and June 8, 1971, checks totalling $473,673.60 were written by High Point of the Midwest and

charged to account No. 03–171–2 by Columbia Union. (Meld # 66)

68. Within a few days after the initial deposit was made, payment upon two of the checks making up the initial deposit was stopped by the makers of the checks. The total of the checks upon which the payment was stopped constituted more than one–half of the initial deposit made on April 27, 1971 to the High Point account. (Meld # 67)

69. Under the rules of the Greater Kansas City Clearing–House Association, and particularly Rule VIII, and of the rules of the Federal Reserve Bank for return of items on which payment is stopped or a check is otherwise dishonored, the drawee bank is required to give telephone advice thereof to the bank in which the item was first deposited. (Meld # 68)

70. On April 30, 1971, Great Western was adjudicated a bankrupt after a voluntary petition in bankruptcy had been filed upon its behalf by William F. Aldridge and High Point of North Carolina. On the same day, Ed Bickerton and Mike Johnson, another officer of Columbia Union, visited the offices of Great Western at 1544 Howell Street in North Kansas City, Missouri for purposes of public relations with the bank's new corporate customer and to determine how High Point wanted its checks drawn up. (Meld # 69)

71. After Great Western filed its bankruptcy petition, Robert L. Jackson, known to Bickerton to be a customer of the bank and a lawyer who handled bankruptcies, told Bickerton that he was going to put a stop on the High Point accounts and take the money to pay Great Western's creditors. Bickerton responded to Jackson's statement by saying "be our guest." Columbia Union took no action in response to Jackson's statement and continued to accept checks for deposit payable to Great Western into the High Point account and honored checks drawn upon the High Point account until the bankruptcy court enjoined further payments out of the account on June 8, 1971. (Meld # 70)

72. Columbia Union had notice or knowledge that Great Western had filed a voluntary petition in bankruptcy and had been adjudicated a bankrupt on April 30, 1971 no later than May 7, 1971 and perhaps no later than two or three days after April 30, 1971, according to E. H. Bickerton. (Meld # 71)

73. Columbia Union acquired notice that Great Western had been placed in bankruptcy from Robert L. Jackson, according to E. H. Bickerton. (Meld # 72)

74. Columbia Union continued to accept checks payable to Great Western for deposit to Columbia Union account No. 03–171–2 endorsed only by Roy Groves and permitted High Point of the Midwest to write checks on that account or to transfer moneys from that account to account No. 03–172–0 after Columbia Union acquired notice that Great Western had been adjudicated a bankrupt. (Meld # 73)

75. Star caused a cashier's check in the amount of $56,000.00 to be withdrawn from the High Point account at Columbia Union on or about May 14, 1971. In so doing, High Point provided Mr. Groves a letter which authorized him to make the withdrawal. (Third–Party Dfdt. Ex. No. 17). Groves testified he presented the letter to Bickerton. Bickerton testified he had no recollection of it. (Meld # 74)

76. On July 20, 1971, Columbia Union filed a complaint for interpleader, Case No. 19550–1, interpleading into the registry of the Court $73,105.10, which was the balance remaining in the High Point accounts at Columbia Union. (Meld # 75)

77. It was not until December 1, 1971, that Columbia Union notified Hartford of its potential liability to the Trustee in Bankruptcy for Great Western under § 70(d) and that the Trustee intended to hold the bank liable for the loss. On December 1, 1971, Columbia Union sent a letter to Hartford enclosing a copy of the Trustee's complaint along with the bank's answer. In the letter, Columbia Union asked that Hartford confirm coverage with respect to the allegations contained in Count IV of the Complaint. (Meld # 76)

78. Hartford declined coverage under the Banker's Blanket Bond on the grounds that the liability asserted by the Trustee in Bankruptcy for Great Western, if established against Columbia Union, would not have constituted a valid and collectible loss under the terms of the bond. (Meld # 77)

79. Through December 31, 1975, Columbia Union paid to its attorneys Lathrop, Koontz, Righter, Clagett, Parker & Norquist, in attorneys' fees and out-of-pocket expenses, the sum of $37,120.78. (Meld # 78)

80. On April 25, 1979, the Trustee dismissed with prejudice its claims against the third-party plaintiff. (Meld # 79)

81. On April 25, 1979, Columbia Union dismissed with prejudice its cross-claims against all other defendants. (Meld # 80)

## II.

### Conclusions of Law

The Court has jurisdiction of this third party action pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 2201, as well as pendent jurisdiction. The parties concede, and the Court agrees, that the substantive law of Missouri applies under the circumstances of this case.

The parties have stipulated that six issues [b] of law are dispositive of this litigation. We shall discuss each issue *seriatim*.

### A.

### Issue No. 1

The first issue as stipulated is:

1. Did Roy Groves practice false pretenses upon Columbia Union by opening an account for High Point of the Midwest on April 27, 1971 at Columbia Union National Bank and depositing thereto checks which for the most part were made payable to Great Western and purportedly endorsed by Great Western over to High Point, by presenting such checks for deposit and by further depositing by mail such checks thereafter under the facts as stipulated and/or determined by the Court in all prior litigation of this case.

### Bank's Position

The bank suggests in its proposed conclusion of law No. 1 that:

1. The representations made by Roy Groves to E. H. Bickerton and Pamela Molnar, and the various concealments of material facts by Groves and other officers and agents of Great Western, Fabrication and High Point, constituted "false pretenses" within the meaning of coverage B of the Blanket Bond.

### Hartford's Position

Hartford states in its proposed conclusions of law Nos. 14 and 12 that:

14. Under the undisputed facts of this case, no false pretenses were practiced upon the bank by Roy Groves in endorsing checks payable to Great Western and depositing them in the High Point account at Columbia Union Bank. The bank was fully informed of the purposes of the account and the fact that Great Western checks were being deposited into that account. The bank stipulated that Roy Groves had been duly authorized by Great Western to so endorse and deposit checks. The bank was informed prior to the opening of the account that Star Sprinkler Corporation had taken over the operation of Great Western and its assets, had formed High Point to complete the contracts of Great Western and that Star had assigned its security agreement to High Point for that purpose. The bank has no evidence to the contrary. Under this undisputed evidence, there could be no false pretenses as a matter of law. *Merchants-Produce Bank v. U. S. F. & G.*, 305 F.Supp. 957 (W.D.Mo.1969); *Jefferson Bank and Trust Co. v. Central Surety and Ins. Co.*, 408 S.W.2d 825 (Mo. 1966); *Fidelity and Casualty Company of New York v. Bank of Altenburg*, 216 F.2d 294 (8th Cir. 1954); *Hartford Accident and Indemnity Company v. Federal Deposit Insurance Corporation*, 204 F.2d 933 (8th Cir. 1953); *United States v. Western Contracting Corporation*, 341 F.2d 383 (8th Cir. 1965).

12. The Trustee's cause of action against the bank was based upon post–bankruptcy transfers made knowingly by the bank. . . . The knowing acceptance of checks payable to Great Western for deposit in the High Point account after the bank's knowledge that Great Western had been declared bankrupt is totally inconsistent with false pretenses; indeed, it establishes a lack of false pretenses. *Merchants–Produce Bank v. U. S. F. & G., supra; Jefferson Bank and Trust Co. v. Central Surety and Ins. Co., supra; Fidelity Cas. Co. of New York v. Bank of Altenburg, surpa.*

### Discussion of Issue No. 1

In its suggestions in support of its proposed conclusion (see Suggestions in Support of Third Party Plaintiff's Motion for Summary Judgment, filed June 17, 1980), Columbia Union relied on the following cases:

*Jefferson Bank and Trust Company v. Central Surety and Insurance Corporation, supra,* (unauthorized endorsements); *Merchants–Produce Bank v. United States Fidelity and Guaranty Company, supra,* (misrepresentation of authority for stock issuance); *Fidelity and Casualty Company of New York v. Bank of Altenburg, supra,* (check kiting scheme); *Hartford Accident and Indemnity Co. v. Federal Deposit Ins. Corp., supra,* (check kiting scheme); *National Bank of Paulding v. Fidelity & Casualty Company,* 131 F.Supp. 121 (S.D.Ohio 1954) (false bills of lading, invoices, and sight drafts); and *Baltimore Bank & Trust Company v. United States Fidelity & Guaranty Company,* 436 F.2d 743 (8th Cir. 1971) (forged promissory note as security).

Columbia Union contends in its suggestions that the scheme involving transfer of Great Western assets to High Point (ultimately held in *Jackson v. Star Sprinkler Corporation of Florida, supra,* to constitute transfers fraudulent as to creditors of Great Western and Fabrication) was not disclosed to Columbia Union, that the bank accounts were opened in furtherance of this scheme, and that Columbia was thus a victim of false pretenses.

While we do not agree with Hartford's conclusion No. 12 that the theory of liability asserted by the trustee under 70(d) would in all cases automatically eliminate the possibility of false pretenses, under the facts as stipulated by the parties in their June 17, 1980 meld, and accurately restated by Hartford in its proposed conclusion of law No. 14, we find and conclude that Roy Groves did not practice false pretenses on the bank. The bank did know of the overt use of the accounts, though under the stipulated facts it did not know of the underlying fraudulent transfer. We find and conclude that the existence of the scheme to defraud creditors of Great Western and Fabrication did not constitute a false pretense practiced on the bank within the meaning of the cited cases.

### B.

### Issue No. 2

The second issue stipulated by the parties is:

2. If the answer to legal issue No. 1 above is affirmative, did the facts which gave rise to the false pretenses cause Columbia Union to be exposed to liability to the trustee within the meaning of the Banker's Blanket Bond.

Though we need not reach this question, having answered the first question in the negative, we shall state our understanding of the positions of the parties and our conclusions of law, in order that the record be complete.

### Bank's Position

The bank suggests in proposed conclusion of law No. 2 that:

2. Said "false pretenses" induced Columbia Union to engage in the course of conduct that ultimately gave rise to the cause of action asserted by the Trustee under Section 70(d) of the Bankruptcy Act.

The bank further amplifies its argument in its June 17, 1980 Suggestions at page 7,

**1274**

et seq. Concisely stated, the bank contends that because Columbia Union would not have opened the High Point accounts if they had been aware of the fraudulent scheme, a causal connection exists between the scheme and the post–bankruptcy transfers which is legally sufficient to bring the trustee's allegations within the false pretense coverage of the bond.

*Hartford's Position*

Hartford responds in its proposed conclusion of law number 10 that:

10. A loss of property by false pretenses as that coverage is used in the bond means a loss due to a false or misleading statement made to the bank by a person with knowledge of its falsity, which was relied upon by the bank to its detriment. *Jefferson Bank and Trust Co. v. Central Surety and Ins. Co.*, 408 S.W.2d 825 (Mo.1966); *Merchants Produce Bank v. U. S. F. & G.*, 305 F.Supp. 957, 964 (W.D.Mo.1969); *Fidelity & Casualty Co. of New York v. Bank of Altenburg*, 216 F.2d 294 (8th Cir. 1954).

In proposed conclusion No. 13, Hartford continues:

13. The undisputed facts show that the bank had knowledge of Great Western's bankruptcy on April 30, 1971. Notably the bank stipulated that it had knowledge of the bankruptcy within a few days after it occurred. The undisputed evidence further establishes that the bank had knowledge that Great Western checks were being deposited into the High Point account commencing with the initial deposit made on April 27, 1971. Any loss or liability incurred by the bank to the trustee was a result of the bank's knowingly permitting transfers of money out of the High Point account after bankruptcy and were not the result of false pretenses. *Merchants Produce Bank v. U. S. F. & G., supra; Jefferson Bank and Trust Co. v. Central Surety and Ins. Co., supra; Fidelity & Cas. Co. of New York v. Bank of Altenburg, supra.*

*Discussion of Issue No. 2*

 Defendant correctly states the law in conclusion No. 10 with the clarification that a nondisclosure may also constitute false pretenses under these cases. The Court hereby adopts defendant's conclusions of law No. 13 and No. 10 with the modification to No. 10 herein suggested.

**C.**

*Issue No. 3*

The third question stipulated by the parties is:

3. In determining legal issues number 1 and 2 above, should the Court consider the allegations of the trustee's complaint against Columbia Union and the facts developed in the underlying litigation which prove those allegations, with the coverage provided by Clause B of the bond, or should the Court consider facts extrinsic to the trustee's allegations against Columbia Union, including those known to Hartford or which could have been known to Hartford by reasonable investigation.

*Bank's Position*

Columbia Union did not propose a conclusion of law with respect to this issue, but clearly states its position in its suggestions in support of its Motion for Summary Judgment at page eleven.

*Hartford's Position*

Hartford's proposed conclusion is as follows:

11. Under Missouri law, the determination of an insurer's obligation to defend an insured from liability is based upon a comparison of the allegations of the complaint against the insured, and the facts underlying those allegations, with the coverage which is provided by the insurer's policy. It is not the theory of liability pursued in the underlying litigation, but the allegations of fact which control. *Merchants Produce Bank v. U. S. F. & G., supra; Zipkin v. Freeman*, 436 S.W.2d 753, 754 (Mo. banc 1969); *City of*

*Palmyra v. The Western Casualty & Surety Co.*, 477 S.W.2d 428 (Mo.App. 1972); *Ira E. Berry v. American States Insurance*, 563 S.W.2d 514 (Mo.App.1978).

### Discussion of Issue No. 3

■ Hartford's proposed conclusion No. 11 basically recites the same standard proposed by the bank except that Columbia Union correctly adds that extrinsic facts reasonably known to the insurer must be considered. We find and conclude that defendant's proposed conclusion No. 11 correctly states the applicable standard when expanded to include that if the actual facts as known to the insurer conflict with the allegations in the complaint, the actual facts control. Actual facts are defined as those which are *known or reasonably should have been known* at the commencement of suit, not as proven or finally determined after litigation. *Marshall's U. S. Auto Supply, Inc. v. Maryland Casualty*, 354 Mo. 455, 189 S.W.2d 529 (Mo.1945); *State ex rel. v. Inter State Oil Co. v. Bland*, 354 Mo. 622, 190 S.W.2d 227 (Mo.1945).

### D.

### Issue No. 4

The fourth issue as stipulated by the parties is:

4. Is Columbia Union precluded from recovery under the Bond because of its failure to provide notice to Hartford as soon as practicable after discovery of the loss to the prejudice of Hartford?

### Bank's Position

The bank proposed in its conclusion of law No. 12 that we conclude simply that "Columbia Union gave timely notice of loss as required by the Banker's Blanket Bond in question."

### Hartford's Position

Hartford proposes the following in conclusions Nos. 7, 8, and 9:

7. Under Missouri law, an insured's unexcused failure to comply with a condition of an insurance policy requiring notice to the insurer relieves the insurer from liability for a loss which might otherwise come within the policy coverage, if the insurer has been prejudiced by the lack of notice. The issue of prejudice is ordinarily a question of fact and the burden is on the insurer to prove prejudice. *MFA Mutual Insurance Company v. Thost*, 561 S.W.2d 431, 433 (Mo.App.1978); *McNeal v. Manchester Life and Indemnity Company*, 540 S.W.2d 113, 119–20 (Mo. App.1976); *Roberts v. New Jersey Insurance Company of New York*, 457 S.W.2d 244, 249 (Mo.App.1970); *Dixon v. United States Fidelity and Guaranty Company*, 155 S.W.2d 313, 317 (Mo.App.1941).

8. Under the terms of the bond and the facts of this case, the bank was required to notify Hartford as soon as practicable after the bank acquired knowledge that a liability was being asserted against it by the bankruptcy estate of Great Western. The undisputed evidence establishes that the bank was made aware of the assertion of such a liability a few days after Great Western was declared bankrupt on April 30, 1971, but did not give notice to Hartford of the asserted liability until December 1, 1971, after the bank had been served in the litigation commenced by the trustee. The bank clearly failed to comply with the notice provision of the bond. *Jefferson Bank and Trust Co. v. Central Surety and Ins. Co.*, 408 S.W.2d 825, 832 (Mo.1966).

9. On the issue of prejudice, the facts also are undisputed. Although the bank admittedly had knowledge of the claimed liability to the bankruptcy estate of Great Western a few days after Great Western's bankruptcy on April 30, 1971, the bank did nothing to reduce or minimize the loss. . . . It is axiomatic that insurance companies commence investigations immediately after receipt of a notice of loss. Had Hartford received the required notice, even a cursory investigation would have elicited facts sufficient to any reasonable person indicating that the interpleader suit should have been filed as soon as the bank became aware of the conflicting claims to the funds. Such

action would have substantially reduced or eliminated the exposure to liability to the Trustee and, if the loss was covered by the bond, to Hartford. Therefore, under the undisputed facts and law, Hartford was prejudiced by the failure of the bank to comply with the notice provision of the bond. *McNeal v. Manchester Life and Indemnity Company,* 540 S.W.2d 113, 119–20 (Mo.App.1976); *Roberts v. New Jersey Insurance Company of New York,* 457 S.W.2d 244, 249 (Mo.App.1970); *Dixon v. United States Fidelity and Guaranty Company,* 155 S.W.2d 313, 317 (Mo. App.1941); 44 Am.Jur.2d *Insurance,* § 1454, *et seq.*

### Discussion of Issue No. 4

An affirmative answer to question No. 4 provides a completely independent ground for the judgment we reach. We find and conclude for the reasons hereinafter stated that the stipulated question must be answered in the affirmative.

One of the crucial questions in this case is when the loss was discovered. Columbia Union contends that liability was discovered when the Trustee's complaint was filed. Hartford contends that the bank discovered its potential liability at the time that Robert Jackson, later Trustee of Great Western, notified Ed Bickerton, an executive officer of the bank, that he was going to put a stop on the High Point accounts and take the money to pay Great Western's creditors (Meld # 70).

■ We find and conclude that Columbia Union must be said to have had notice of its potential liability after Jackson's conversation with Bickerton in May, 1971, long before it notified Hartford, and that Hartford was prejudiced by this delay. *Jefferson Bank and Trust Co. v. Central Surety and Insurance Co., supra.*

Since both parties rely on the *Jefferson Bank* case, a short discussion of the holding in that case is appropriate. In *Jefferson Bank* the court held the loss was discovered when the formal complaint was filed. In *Jefferson,* however, prior to filing the formal complaint, the plaintiff did not even

"intimate that it claimed any rights against the bank". In fact, the plaintiff clearly led the bank to believe that a claim was being asserted only against another party.

The Court in *Jefferson* held that a discovery occurs when facts are known "which would lead a reasonable person to an assumption that the bank has suffered a loss by the reason of its handling of the account of its customer," or "when the bank must reasonably have known and recognized" that a loss was suffered and that an attempt to hold the bank liable would be made. 408 S.W.2d at 832.

The Court adds, at 832, "we do not mean by this holding to state that in each and every instance the time of discovery of a loss of this character necessarily is simultaneous with formal demand by the customer on the bank, but we do hold under the particular facts of this case that this was the time of discovery of Jefferson's loss."

It is clear in this case that the bank reasonably should have known in early May, 1971 that Jackson intended to assert a claim to the funds in the High Point accounts.

Columbia Union's second contention in its Suggestions in Support of its Motion for Summary Judgment filed June 17, 1980 is that any notice given in May would have been invalid because the claim asserted in May, 1971 was completely distinct from that asserted on November 29, 1971. The bank contends that "the earlier claim was directed solely to funds presently held in the High Point accounts" while the latter claim "sought to recover monies that had gone through the High Point accounts and been paid to third parties." This attempted distinction ignores the fact that almost all the monies subsequently claimed were processed through the account between early May and June 8, 1971, when the account was finally frozen. As an additional $473,-673.60 passed through the account between May 3, 1971 and June 8, 1971, Hartford could have been prejudiced had the liability asserted by the Trustee against the bank been covered under the bond.

Had Hartford been notified in early May, 1971 of the fact that Columbia Union was going to disregard the potential claim of Jackson, Hartford obviously could have protested and caused Columbia Union to reconsider its position. Columbia Union's failure to notify Hartford prejudicially deprived Hartford of the opportunity to protest Columbia Union's disregard of Jackson's claim.

### E.

#### Issue No. 5

The fifth stipulated issue of law is:

5. Is knowledge of any Columbia Union employee acting within the scope of their employment that checks payable to Great Western were being deposited in the account of High Point imputable to the bank or must it be proved that an officer or director of the bank had such knowledge in order for that knowledge to be imputable to the bank?

As a subhead of this issue the parties also stipulated the following issue:

5(a). If Columbia Union had knowledge of the deposit of the checks in question on April 27, 1971, the day the account was opened and three days before the bankruptcy of Great Western, is that sufficient to prove that Columbia Union had notice of such checks being deposited after bankruptcy? (Hartford denies this is a legal issue in the case for the following reasons: (1) It is entirely inconsistent with statements made by the bank's counsel at pretrial conferences prior to the trial setting on May 14, 1980; (2) it was not included as a legal issue in the Pre–Trial Stipulation filed by the parties on April 30, 1980; (3) it was not briefed in the plaintiff's Pre–Trial Brief filed on May 8, 1980; (4) it is totally contrary to plaintiff's proposed instruction submitting the issue of notice to the bank to the jury, which instruction referred to notice *at any time before* the accounts of High Point were frozen on June 8, 1971; (5) it was brought up for the first time on May 14, 1980, after the pretrial conference when the parties met

to agree on a Pre–Trial Order to submit the case under Rule 56(d).

#### Bank's Position

The bank proposes the following conclusions of law based on its interpretation of the applicable cases:

3. Pamela Molnar's position as a new accounts clerk in April of 1971 was a ministerial or clerical position.

4. Notice or knowledge of Pamela Molnar of the nature of the initial deposit to the accounts of High Point Sprinkler Company of the Midwest on April 27 and April 28, 1971 was not notice or knowledge of such fact to Columbia Union.

5. The clerks or tellers working in the mail deposit department of Columbia Union in April, May, June and July of 1971 were clerical or ministerial employees.

6. Notice to or knowledge of such tellers or clerks of the nature of deposits received by mail for the accounts of High Point were not notice to or knowledge of such fact by Columbia Union.

7. Alternatively, notice or knowledge of the nature of the initial deposit to the accounts of High Point Sprinkler Company of the Midwest to either Pamela Molnar or E. H. Bickerton on April 27 or April 28, 1971, was not notice or knowledge to Columbia Union of the nature of the deposits made to such accounts after April 30, 1971.

#### Hartford's Position

Hartford contends that an opposite conclusion must be reached. It proposes in conclusion No. 6, in part, that:

6. . . . Knowledge to the bank can be established by a showing of knowledge of any employee acting in the scope of their employment. It is not necessary that the employee be an executive officer of the bank, but knowledge of an executive officer is clearly knowledge of the bank. *Everready Heating and Sheet Metal, Inc. v. D. H. Overmeyer, Inc.*, 476 S.W.2d 153, 155 (Mo.App.1972); *Ronchetto v. State Bank of Bevier*, 227 Mo.App.

83, 51 S.W.2d 174 (Mo.App.1932); *Newco Land Co. v. Martin*, 358 Mo. 99, 213 S.W.2d 504, 511 (Mo.1948); *Thomason v. Miller*, 555 S.W.2d 685, 688 (Mo.App. 1977).

### Discussion of Issue No. 5

Columbia Union contends in its suggestions in support of its Motion for Summary Judgment at page sixteen, *et seq.*, that there is no proof that the bank as a legal entity knew that checks payable to Great Western were being deposited in the account of High Point after the date of bankruptcy, i. e., after April 30, 1971. The bank asserts at page eighteen that knowledge of mail–room clerks is not knowledge imputable to the bank as a corporate entity, citing *Gregmoore Orchard Co. v. Gilmour*, 159 Mo.App. 204, 140 S.W. 763 (Spgfld.App. 1911), among others, and that no bank executive ever had knowledge that the checks were continuing to be processed through the account.

While the ultimate determination of the bank's knowledge of post–bankruptcy transfers might have affected the determination of liability to the Trustee, we do not find it determinative on the question of the bond coverage and Hartford's alleged liability to Columbia. However, for the purpose of answering the stipulated question only, we assume that if the bank lacked knowledge of post–bankruptcy transfers, it might affect the determination of false pretenses. We find and conclude that the knowledge of the bank's agents is in this case imputable to the bank.

We hold that the knowledge of Pam Molnar of the initial deposits, as gained in the discharge of her authorized duty, and the knowledge of the mailroom clerks of the continuing deposits, gained while acting within the scope of their individual authority, is legally imputed to Columbia Union. *Ronchetto v. State Bank of Bevier*, 51 S.W.2d 174, 177 (K.C.App.1932); *Mid–Continent Nat. Bk. v. Bank of Independence*, 523 S.W.2d 569 (Mo.App.1975).

We conclude as a matter of law that Molnar also held a position distinguishable from that of clerical or ministerial employees whose knowledge sometimes is not imputed to a corporation employing them. It is stipulated that Molnar handled the opening of all accounts, and, indeed, set up the procedures for doing so and knew more about these procedures than many of the bank's officers. Even if plaintiff is correct in asserting that Bickerton did not review the initial deposit and approve the account, Molnar, acting within the scope of her employment, did review the checks. It is her functional position and the knowledge acquired in performing the duties of that position which control.

### F.

### Issue No. 6

The final issue stipulated for decision by this Court is:

6. Was the refusal by Hartford to accept the tender of defense and costs thereof of the claim by the trustee against Columbia Union vexatious within the meaning of § 375.420 (RSMo.1969)?

### Discussion of Issue No. 6

For the reasons stated above in our discussion of the first five stipulated issues, it is clear that Hartford's refusal to defend was proper and therefore could not be considered to be vexatious.

Accordingly, it is

ORDERED that the Clerk enter judgment for the third–party defendant, Hartford, against third–party plaintiff, Columbia Union, on all counts of the third–party complaint in accordance with this opinion.